**Jerome HENDERSON, Petitioner,**

v.

**Terry COLLINS, Respondent.**

No. C–1–94–106.

United States District Court, S.D. Ohio, Western Division.

Aug. 4, 1999.

**874**

Harry R. Reinhart, Columbus, OH, Gerald Gordon Simmons, Columbus, OH, for Jerome Henderson, petitioner.

Lee I. Fisher, Ohio Attorney General, Columbus, OH, Jonathan R. Fulkerson, Assistant Attorney General, Capital Crimes Section, Columbus, OH, Stuart W. Harris, Stephanie L. Watson, Ohio Attorney General, Corrections Litigation, Columbus, OH, for Terry Collins, Warden SOCF, respondent.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Petitioner Jerome Henderson's Petition for a Writ of Habeas Corpus (doc. 4); Respondent's Return of Writ (doc. 12); and Petitioner's Motion for Leave to File Traverse, Memorandum of Procedural Default, Motion to Expand the Record, and Motion to Compel Respondent to Complete the Record Instanter (doc. 77). The Court also takes into consideration Petitioner's Post–Hearing Memorandum (doc. 94) and Respondent's Post–Oral Argument Brief (doc. 97).

### Table of Contents

I. Introduction .................................................... 875

II. Factual Background ............................................. 876

III. Standard of Review ............................................. 878

IV. Applicability of the AEDPA ..................................... 878

V. Analysis of Petitioner's Claims ................................. 878
 A. The Doctrine of Procedural Default ......................... 879
 B. Petitioner's Claim of Ineffective Assistance of Appellate Counsel ............. 880
 —Claims 13 & 27 ......................................... 880
 C. Other Claims Respondent Asserts Were Procedurally Defaulted ............. 888
 —Claim 2(A) ............................................. 880
 —Claim 8 ................................................ 889
 —Claim 10 ............................................... 890
 —Claim 10(A) ............................................ 891
 —Claim 10(B) ............................................ 892
 —Claim 11 ............................................... 895
 —Claim 12 ............................................... 896

—Claim 14 ...................................................896
—Claims 17(A) & 24 ..........................................897
—Claim 19 ...................................................897
—Claim 25 ...................................................898
—Claim 26 ...................................................898
D. Claims That Must Be Addressed On The Merits .........................899
—Claim 1 ....................................................899
—Claim 2 ....................................................902
—Claim 3 ....................................................904
—Claim 4 ....................................................905
—Claim 5 ....................................................908
—Claim 6 ....................................................910
—Claim 7 ....................................................911
—Claim 9 ....................................................913
—Claim 16 ...................................................918
—Claim 17 ...................................................919
—Claim 18 ...................................................920
—Claims 20, 21, 22 & 23 .....................................923
—Claim 26 (Merits) ..........................................924
—Claims 10(A) and 10(B) (Merits) ............................928
E. Conclusion .................................................929

# I. INTRODUCTION

This is a capital case. Petitioner Henderson has been sentenced to death by the State of Ohio.

Petitioner was convicted of aggravated murder and sentenced to death by the Hamilton County Court of Common Pleas for the murder of Mary Acoff in her home at 1944 Highland Avenue in Cincinnati, Ohio on or about March 3, 1985. The jury recommended the state court sentence Petitioner to death for the aggravated murder conviction. The jury also recommended that Petitioner be sentenced to consecutive prison terms of seven to twenty-five years for the aggravated burglary conviction and eight to fifteen years for the attempted rape conviction (Appendix to Return of Writ ("R.O.W."), Vol. I, Ex. B). At his capital trial, Petitioner was represented by attorney Clayton Shea.

On July 22, 1986, Petitioner pursued a direct appeal of his conviction in the Ohio Court of Appeals, asserting fourteen assignments of error related to his trial proceedings (*Id.*, Ex. D). Additionally, after noting that issues of proportionality review could not be raised as an assignment of error, Petitioner objected to the adequacy of the court's proportionality review in a separate section of his appeal (*Id.* at 48). Subsequent to the State filing its brief in opposition, Petitioner filed a *pro se* motion for leave to rebrief and file additional issues on September 25, 1986 (*Id.*, Ex. NN).[1] In his *pro se* motion, Petitioner maintained that his appellate counsel failed to raise several issues that he believed should have been raised. The court denied Petitioner's motion for leave to rebrief and file additional issues on October 15, 1986 (*Id.*, Vol. IV, Ex. PP). The Court of Appeals also affirmed his conviction and sentence of death on January 14, 1987 (*Id.*, Vol. I, Ex. F). In his direct appeals, Petitioner was represented by attorneys D. Shannon Smith and Timothy A. Smith.

Petitioner appealed to the Ohio Supreme Court (*Id.*, Ex. G). The Ohio Supreme Court affirmed his conviction and sentence on September 28, 1988 (*Id.*, Ex. I). *State v. Henderson*, 39 Ohio St.3d 24, 26, 528 N.E.2d 1237, 1240 (1988). He was again represented by attorneys D. Shannon Smith and Timothy A. Smith. Petitioner then filed a Petition for Writ of Certiorari to the United States Supreme Court. However, the Supreme Court denied the Petition. *See Henderson v. Ohio*, 489 U.S.

---

1. Although Petitioner inadvertently failed to include Exhibit NN in the Appendix to the Return of Writ, a courtesy copy was provided to the Court.

1072, 109 S.Ct. 1357, 103 L.Ed.2d 824, *reh'g denied,* 490 U.S. 1042, 109 S.Ct. 1947, 104 L.Ed.2d 417 (1989).

Thereafter, Petitioner pursued post-conviction relief in the Ohio courts on November 15, 1989 (Appendix to R.O.W., Vol. II, Ex. L). The State moved to dismiss each of the claims in Petitioner's post-conviction petition. Petitioner subsequently moved to amend his post-conviction petition to assert a claim of ineffective assistance of appellate counsel (*Id.,* Ex. O). Petitioner asserted that his counsel on appeal had failed to raise the claim of ineffective assistance of trial counsel. Petitioner also moved that the court hold an evidentiary hearing on the claim to address matters outside the record. The court dismissed each of Petitioner's post-conviction claims on the grounds of *res judicata,* except for his eighth claim of ineffective assistance of trial counsel (*Id.,* Ex. Q). The court conducted an evidentiary hearing on December 17 and 18, 1990, to address Petitioner's claim of ineffective assistance of trial counsel. The court denied Petitioner's motion to amend his post-conviction petition and struck the motion from the record (*Id.,* Ex. S).

Petitioner filed a notice of appeal to the Hamilton County Court of Appeals on February 22, 1991 (*Id.,* Ex. T). On March 7, 1991, the court ordered the cause dismissed on the grounds that the notice of appeal was untimely (*Id.,* Vols. II & III, Exs. V & W). Petitioner next appealed to the Ohio Supreme Court; however, the Ohio Supreme Court sustained the dismissal (*Id.,* Vol. IV, Ex. AA). The Ohio Supreme Court also denied a motion by Petitioner for a rehearing on September 18, 1991 (*Id.,* Ex. FF).

On December 5, 1991, Petitioner filed a Petition for a Writ of Habeas Corpus with this Court. However, on September 22, 1992, this Court dismissed the petition without prejudice to enable Petitioner to exhaust his claim of ineffective assistance of appellate counsel in the Ohio courts (*See* Order issued September 22, 1992).

On November 23, 1992, Petitioner filed an Application for delayed Reconsideration in the Hamilton County Court of Appeals (R.O.W., Ex. GG). On March 12, 1993, the court of appeals denied Petitioner's Application (R.O.W., Ex. HH). On May 7, 1993, Petitioner appealed the decision of the court of appeals to the Ohio Supreme Court. However, the Ohio Supreme Court affirmed the appellate court's decision on October 27, 1993 (*Id.,* Ex. MM).

Petitioner then filed the current Petition for a Writ of Habeas Corpus in this Court pursuant to Title 28 U.S.C. § 2254 on February 4, 1994 (doc. 4). Respondent filed his Return of Writ on June 10, 1994 (doc. 12). After a flurry of filings by the parties and orders by the Court, the Court held a hearing on the Petition for a Writ of Habeas Corpus on December 3, 1997. Subsequent to the hearing, Petitioner filed a post-hearing memorandum on January, 12, 1998. Respondent also filed a post-hearing memorandum on January 16, 1998.

## II. FACTUAL BACKGROUND

The charges against Petitioner arose from events that occurred on March 3, 1985. The following factual background comes directly from the Ohio Supreme Court's opinion in this case, in which the court affirmed the conviction and sentence of Petitioner.

Around 10:45 p.m., March 2, 1985, [Mary] Acoff left her basement-level apartment at 1944 Highland Avenue in Cincinnati and went to the apartment of her boyfriend, James Martin, who lived in the same building. Martin and Acoff engaged in sexual intercourse. Acoff left around midnight and returned to her apartment.

Tony Nixon, who lived in the apartment above Acoff, testified that around 4:50 a.m. on March 3, 1985, he heard sounds 'like a commotion' coming from below. After Nixon stepped into the hallway of the building to await his ride to work he

heard a downstairs door open. However, he did not see anyone downstairs. Cheryl Turner testified that as she drove toward the building about 6:00 a.m. to pick up Nixon, she saw [Petitioner] standing on the street a little way up from the building. She stated that [Petitioner] was wearing a dark, knee-length coat.

Delrick Johnson testified that as he approached the Highland Avenue area around 5:30 a.m., he saw [Petitioner], whom he knew from school. Johnson honked his horn at [Petitioner], who responded by pulling his coat up around his ears. Johnson stated that [Petitioner] was wearing a long leather coat with a shorter coat underneath.

About 4:15 p.m., March 3, 1985, ten-year old Joann Acoff, Mary Acoff's daughter, and Sandra Simmons, a neighbor, found Acoff's body on the living room floor of the apartment. The front door was unlatched and a kitchen window was closed but unlocked.

The police found latent fingerprints, mud on the kitchen and living room floors, and blood stains on the outside kitchen windowsill. A blood-stained rock and fallen leaf were found on the ground outside the kitchen window. The ground beneath the kitchen window was muddy.

Acoff died as a result of hemorrhage due to multiple stab, incised and blunt injuries to the head, chest, neck and upper extremities. In addition to at least four fatal stab wounds, Acoff had been cut with the point of a sharp knife numerous times and her throat had been slashed at least thirteen times. Acoff's left hand had been cut and was wrapped in a towel.

Acoff's body was found nude, lying face up with legs spread apart. Semen was found in her vagina. The deputy coroner testified that the general pattern of bloodstains over the upper torso indicated that Acoff was killed while she was lying in a horizontal position.

The front door of the apartment building was kept locked. To gain entry without a key, one had to ring the doorbell of an apartment and have the occupant open the front door. On the day of the murder, Acoff's doorbell was not working.

Apparently nothing was stolen from the apartment: Acoff's purse was undisturbed, a gold chain was found lying in a pool of blood on the floor and the stereo and television set were in place.

Upon learning of [Petitioner's] presence in the neighborhood, police called him and he went to the police station to be interviewed. [Petitioner] denied being in the vicinity of Acoff's apartment at the time of the murder. He was permitted to leave the police station.

Shortly thereafter, police were told that a latent fingerprint lifted from the kitchen wall of Acoff's apartment had been identified as [Petitioner's]. Police arrested [Petitioner] and informed him of the fingerprint, but [Petitioner] insisted that he had never been inside of Acoff's apartment and that he did not know her.

Police searched [Petitioner's] residence pursuant to a warrant and seized a damp pair of gym shoes, a long black leather coat, a short black leather jacket, and an eight-inch paring knife discovered inside the pocket of the jacket. The soles of the shoes contained human blood but in an insufficient amount to determine its type. A bloody shoeprint from the floor of Acoff's apartment was consistent with the characteristics of the soles of the seized gym shoes. Bloodstains found on the coat were consistent with Acoff's blood type (type AB) and inconsistent with [Petitioner's] (type O). A piece of unidentifiable human tissue was discovered on the long coat. Semen stains, consistent with type O secretor, were also found on the coat.

The rock outside of the kitchen window was stained with type AB blood and the fallen leaf with human blood, type unknown.

[Petitioner] was charged with two (2) counts of aggravated murder with specifications that: (1) [Petitioner], as a principal offender, purposely caused Acoff's death while committing or attempting to commit aggravated burglary; and (2) [Petitioner], as principal offender, purposely caused Acoff's death while committing or attempting to commit rape. The third and fourth counts charged [Petitioner] with aggravated burglary and rape.

[Petitioner] pled not guilty. The jury found [Petitioner] guilty of both counts of aggravated murder and the accompanying specifications. The jury also found [Petitioner] guilty of aggravated burglary and not guilty of rape but guilty of attempted rape. The jury recommended a penalty of death; the trial court followed the recommendation and imposed a death sentence. The court further sentenced [Petitioner] on counts three and four to consecutive terms of imprisonment.

*Henderson*, 39 Ohio St.3d at 24–25, 528 N.E.2d 1237.

## III. STANDARD OF REVIEW

In the instant matter, Petitioner seeks relief under 28 U.S.C. § 2254. Section 2254, Title 28 of the United States Code, provides that "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Title 28 U.S.C. § 2254(a) (1994).

## IV. APPLICABILITY OF THE AEDPA

On April 24, 1996, President William Jefferson Clinton signed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act") into law. While the Act does not contain an effective date, we conclude that it became effective on the date of enactment. *Zuern v. Tate*, 938 F.Supp. 468, 470 (S.D.Ohio 1996). Furthermore, even though the Act amends certain provisions of the preexisting habeas corpus statute that are codified in Chapter 153 of the Judicial Code and creates a new Chapter 154 of the Judicial Code containing a set of "Special Habeas Corpus Procedures in Capital Cases," the new subsection of 2254, namely § 2254(d), is inapplicable to cases under Chapter 153 that were pending on the date the Act became effective. *See Lindh v. Murphy*, 521 U.S. 320, 322–23, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Groseclose v. Bell*, 130 F.3d 1161, 1164 (6th Cir.1997); *Powell v. Collins*, C–1–94–656 (S.D.Ohio June 15, 1998). Accordingly, the amended sections of the habeas corpus statute falling under the Act's Chapter 153 do not apply to the instant Petition because the Petition was filed prior to its enactment.

As for Chapter 154 of the Act, it states that it shall apply to cases pending on or after the date of enactment of the Act. The special procedures in Chapter 154 provide a system of expedited review to states that qualify under the opt-in procedures set forth in Title 28 U.S.C. § 2261 (1996). These procedures pertain to requirements for the appointment of counsel for petitioners seeking post-conviction review of their capital sentences in the state court system. Having previously examined this topic, we again conclude that the State of Ohio has not "opted-in." Therefore, we find that Chapter 154 does not apply to this case. *See Mills v. Anderson*, 961 F.Supp. 198, 199 (S.D.Ohio 1997); *Scott v. Anderson*, 958 F.Supp. 330, 334–35 (N.D.Ohio 1997); *Hamblin v. Anderson*, 947 F.Supp. 1179, 1183 (N.D.Ohio 1996); *Landrum v. Anderson*, C–1–96–641 (S.D.Ohio Dec. 9, 1996). Accordingly, pre-AEDPA law applies to the instant petition.

## V. ANALYSIS OF PETITIONER'S CLAIMS

As a preliminary matter, we must address each of the claims that Respondent asserts Petitioner procedurally defaulted. Once it is determined conclusively which, if

any, of Petitioner's claims have been waived, the Court will address all of the claims that can be heard on the merits. Accordingly, we now proceed directly to the procedural default analysis.

### A. The Doctrine of Procedural Default

■ The principles of procedural default are triggered whenever the state argues that a habeas corpus petition is precluded due to a petitioner's failure to comply with a state procedural rule. Generally, under the doctrine of procedural default, if the state court previously dismissed a state inmate's federal claim on the grounds that the inmate failed to comply with a state procedural rule, a federal district court cannot consider the merits of the federal claim.

■ To determine whether the district court may consider the merits of an inmate's federal claim, the court must engage in a complicated analysis. First, the court must determine whether a state procedural rule exists that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). Second, the court must decide whether the state courts actually enforced the state procedural violation. *Id.* In other words, the highest state court to rule on the claim must have clearly and unambiguously relied upon the procedural violation as the reason for rejecting the claim. Third, the court must decide whether the state procedural violation provided an "adequate and independent state ground" for denying the petitioner's federal constitutional claim. *Id.; see also Harris v. Reed*, 489 U.S. 255, 260–62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The application of the "adequate and independent" state ground doctrine is grounded in concerns of comity and federalism because, without the rule, a federal district court would be able to do in habeas corpus what the state court could not do on direct appeal. *Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

■ Once the federal district court determines that the petitioner failed to comply with a state procedural rule, that the rule was actually enforced by the state courts, and that the rule was an adequate and independent state ground, then the petitioner can still have the procedural default bar removed by either: 1) demonstrating that there was "cause" for him to not follow the procedural rule and that he was actually "prejudiced" by the alleged constitutional error, or 2) establishing that his case falls within a category of cases where the court's failure to consider the claims will result in a "fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Maupin*, 785 F.2d at 138; *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir.1985).

■ The Supreme Court has not precisely established the contours of the "cause" standard for courts to apply in the context of procedural default. *Amadeo v. Zant*, 486 U.S. 214, 221, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Generally, a petitioner may show "cause" by demonstrating a substantial reason to excuse the procedural default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994). As stated, once "cause" for the procedural default is demonstrated, the petitioner must still show that he was actually prejudiced by the claimed constitutional error. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The prejudice prong is not satisfied if there is strong evidence of the petitioner's guilt and a lack of evidence to support his claimed constitutional error. *Rust*, 17 F.3d at 162.

■ We note that unless the last state court rendering a judgment in a case "clearly and expressly" states that its judgment rests upon a state procedural ground that has been violated, federal courts on habeas review typically presume

that a procedural default does not bar consideration of federal claim. *Harris*, 489 U.S. at 263, 109 S.Ct. 1038. This presumption, however, only applies to cases where the decision of the last state court rendering judgment in the case "fairly appears to rest primarily on federal law, or to be interwoven with federal law." *Coleman*, 501 U.S. at 734–40, 111 S.Ct. 2546; *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). In a case where the last decision rendered by the state court is unexplained or unclear as to the grounds for the decision, a federal court may "look through" the unexplained order to the last reasoned state court order on the matter and presume that the later unexplained order rests on the same grounds as the explained order. *Ylst*, 501 U.S. at 802–804, 111 S.Ct. 2590.

In this case, the claims for relief and particular sections therein that Respondent maintains Petitioner procedurally defaulted include: 2(A), 8, 10–15, 17(A), 19, 24–26,[2] and 27. We shall first review the claim of ineffective assistance of appellate counsel. Respondent asserts that this claim has been waived by Petitioner. Next, we shall review the other grounds Respondent maintains have been waived by Petitioner. Finally, we shall address the claims Respondent concedes can be heard on the merits. These claims include: 1–7, 9, 16–18, and 20–23.

### B. Petitioner's Claim of Ineffective Assistance of Appellate Counsel

*CLAIMS 13 & 27:*

**Petitioner was denied the effective assistance of counsel on direct appeal in violation of the Fifth, Sixth, and Eighth and Fourteenth Amendments. Petitioner was denied due process of law by the arbitrary refusal of the state appellate and supreme courts to allow him to access newly created procedure by which to raise his claims of ineffective assistance of appellate assistance on direct appeal.**

In his thirteenth claim for relief, Petitioner argues that the Court of Appeals, First Appellate District of Hamilton County, Ohio erred when it denied his *pro se* motion to rebrief and raise seven (7) additional assignments of error and fourteen (14) additional issues in his appellate brief that his appellate counsel failed to identify. By not raising the 7 additional assignments of error and 14 additional issues, Petitioner argues that his counsel were ineffective on appeal.

Petitioner asserts that, during his post-conviction proceedings, he attempted to amend his post-conviction petition to raise the issue of ineffective assistance of appellate counsel as a thirteenth cause of action because his attorneys failed to raise the issue of ineffective assistance of trial counsel on direct appeal (Appendix to R.O.W., Vol. II, Ex. O). However, the State opposed Petitioner's motion to amend his post-conviction petition. The court denied petitioner's motion and struck it from the record (*Id.*, Ex. S).

In the instant matter, Petitioner maintains that the State violated his constitutional rights by first precluding him from raising the assignments of error and issues on direct appeal, and then subsequently denying him the ability to establish his appellate counsels' ineffectiveness at the post-conviction proceeding. In particular, Petitioner contends that the failure of the State to provide a procedure by which to raise the issue of ineffective assistance of appellate counsel where such issue is based on facts outside the record violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

To the contrary, Respondent argues that there is no right under Rule 16 of the Ohio Rules of Appellate Procedure to hybrid representation, and that Petitioner failed

---

**2.** Of Claim 26, Respondent argues that 26, 26(C)(2), 26(C)(2)(a), 26(C)(2)(b), 26(C)(3), 26(C)(4), 26(C)(5), 26(C)(6), 26(C)(7) have been procedurally defaulted by Petitioner.

to raise his claims in his appellate brief in accordance with state procedure. Respondent contends that it was not until after Petitioner's counsel filed his appellate brief and the State filed its response that Petitioner then filed a *pro se* motion for leave to rebrief and file additional issues on September 25, 1986. On October 3, 1986, the State filed a memorandum in opposition to Petitioner's motion, contending that the motion was not only late, but also that Petitioner did not have a right to hybrid representation. Thus, Respondent asserts that the appellate court appropriately denied his motion in accordance with Rule 16.

Respondent also points out that Petitioner's first federal habeas petition was dismissed for failing to exhaust his ineffective assistance of appellate counsel claim. After the dismissal, Petitioner filed an application for delayed Reconsideration and raised a *Murnahan* claim. However, the appellate court denied his application for delayed Reconsideration and his *Murnahan* petition as being untimely. Subsequently, the Ohio Supreme Court affirmed the appellate court's judgment. Respondent firmly maintains that Petitioner procedurally defaulted his claim of ineffective assistance of counsel on direct appeal because he failed to comply with an adequate and independent state procedural rule that was actually enforced. Furthermore, Respondent asserts that Petitioner cannot show cause for his failure to comply with the state rule, nor demonstrate actual prejudice. Although Respondent does not contest that the Fourteenth Amendment mandates the effective assistance of counsel on appeal, Respondent argues that the appellate counsel does not have a duty to raise nonfrivolous issues on appeal if that counsel, as a matter of professional judgment, decides not to raise an issue on appeal. In essence, Respondent asserts that Petitioner makes nothing more than bare assertions of his appellate counsels' ineffectiveness in his Petition, and, thus, this claim should be denied.

■ We note that Rule 16(C) of the Ohio Rules of Appellate Procedure states that: '

> The appellant may file a brief in reply to the brief of the appellee, and, if the appellee has cross-appealed, the appellee may file a brief in reply to the response of the appellant to the assignments of errors presented by the cross-appeal. *No further briefs may be filed except with leave of court.*

Ohio App.Rule 16(C) (emphasis added). Under Rule 16(C), the court has discretion to determine whether to address the issues raised by Petitioner in his *pro se* brief upon appeal. *State v. White*, 71 Ohio App.3d 550, 551, 594 N.E.2d 1087, 1088 n. 1 (1991). The court chose to decline reviewing Petitioner's *pro se* brief. Such a rejection by the court is not improper because no federal or state right to this sort of "hybrid representation exists". *United States v. Mosely*, 810 F.2d 93, 97–98 (6th Cir.1987); *State v. Landrum*, 53 Ohio St.3d 107, 119, 559 N.E.2d 710, 725 (1990); *State v. Thompson*, 33 Ohio St.3d 1, 6, 514 N.E.2d 407, 413–14 (1987); *State v. Beaver*, 119 Ohio App.3d 385, 401, 695 N.E.2d 332, 343 (11th Dist.1997). Therefore, we find that the court did not abuse its discretion when it denied Petitioner's *pro se* brief on direct appeal.

■ Petitioner argues that the court erred when it did not allow him to amend his post-conviction petition to assert his ineffective assistance of appellate counsel claim. However, an accused may not use a post-conviction petition to raise a claim of ineffective assistance of his appellate counsel. *State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992). In *Murnahan*, which was decided on February 19, 1992, after Petitioner filed his post-conviction petition, the Ohio Supreme Court stated:

> 1. Claims of ineffective assistance of appellate counsel are not cognizable in post-conviction proceedings pursuant to R.C. 2953.21.

2. Claims of ineffective assistance of appellate counsel may be raised in an application for Reconsideration in the court of appeals or in a direct appeal to the Supreme Court pursuant to Section 2(B)(2)(a)(iii), Article IV of the Ohio Constitution.

3. Where the time period for Reconsideration in the court of appeals and direct appeal to the Supreme Court has expired, a delayed claim of ineffective assistance of appellate counsel must first be brought in an application for delayed Reconsideration in the court of appeals where the alleged error took place, pursuant to App.R. 26 and 14(B), and if the delayed Reconsideration is denied then the defendant may file for delayed appeal in the Supreme Court, pursuant to Section 8, Rule II of the Rules of Practice of the Supreme Court.

*Murnahan,* 63 Ohio St.3d 60, 584 N.E.2d 1204 at syllabi ¶¶ 1, 2, 3, 584 N.E.2d at 1205 (internal citations omitted). Thus, the appropriate place for raising a claim of ineffective assistance of appellate counsel is either through an application for reconsideration or delayed Reconsideration, or through a direct appeal to the Ohio Supreme Court.

Approximately eighth months after *Murnahan* was decided, Petitioner filed his Application for delayed Reconsideration of his Direct Appeal with the Hamilton County Court of Appeals pursuant to App.R. 14(B), App.R. 26, and *Murnahan* (Appendix to R.O.W., Vol. IV, Ex. GG). In this Application, Petitioner alleged that he had received ineffective assistance of appellate counsel and he listed and explained fifteen (15) errors that had occurred at Petitioner's trial and six (6) issues that were not raised by previous appellate counsel, but that he argued are nonetheless substantial and meritorious. (*Id.*) The Hamilton County Court of Appeals denied Petitioner's motion for delayed Reconsideration as being untimely, stating:

Appellant has failed to demonstrate good cause pursuant to App.R. 14(B) to justify the delay in applying for reconsideration beyond the time permitted by App.R. 26. In view of the settled law in this district with respect to the pursuit of claims of ineffective assistance of counsel, *see, e.g., State v. Rone* (Aug. 31, 1983), Hamilton App. No. C–820640, 1983 WL 5172, unreported, we specifically reject, under the circumstances of this case, the proposition that good cause for the delay is provided by the Ohio Supreme Court's decision in *State v. Murnahan,* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204.

(*Id.,* Ex. HH). Thereafter, Petitioner filed a notice of appeal from the decision denying his Application for delayed Reconsideration and he requested leave to file an appeal as of right (*Id.,* Exs. II & JJ). However, on October 27, 1993, the Ohio Supreme Court affirmed the judgment of the court of appeals, ruling that "[t]his cause, here on appeal from the Court of Appeals for Hamilton County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the court of appeals is affirmed" (*Id.,* Ex. MM). Consequently, Petitioner asserts that he was denied due process of law by the arbitrary refusal of the state appellate and supreme courts to allow him to access a procedure created in *Murnahan* by which to raise his claims of ineffective assistance of appellate assistance on direct appeal.

Respondent argues that Petitioner's claim of ineffective assistance of appellate counsel is procedurally defaulted because he failed to timely raise this claim in state court pursuant to *Murnahan.*

The Parties' contentions raise the issue of whether the state procedural rules used to bar Petitioner's claim of ineffective assistance of appellate counsel in the state courts were firmly established at the time Petitioner would have had to comply with them so as to constitute adequate and independent state procedural rules for the purposes of federal habeas review.

As stated earlier, in *Murnahan*, the Ohio Supreme Court resolved the conflict in the Ohio courts of appeals and held that ineffective assistance of appellate counsel claims cannot be raised in post-conviction proceedings but rather should be raised in motions for delayed reconsideration in the court of appeals. *Murnahan*, 63 Ohio St.3d at 65–66, 584 N.E.2d at 1209.[3] The Ohio Supreme Court established the following procedures:

in an individual case where a defendant has put forth a colorable claim of ineffective assistance of appellate counsel, where the circumstances render the application of *res judicata* unjust, and the time periods for Reconsideration in the court of appeals and direct appeal to this court have expired, he or she must: (1) apply for delayed Reconsideration in the court of appeals where the alleged error took place pursuant to App.R. 26 and 14(B), and if delayed Reconsideration is denied, then (2) file for delayed appeal in this court pursuant to Section 8, Rule II of the Rules of Practice of the Supreme Court.

*Murnahan*, 63 Ohio St.3d at 66, 584 N.E.2d at 1209.

At the time of the Court's decision in *Murnahan*, Ohio App.R. 26 provided,

[a]n application for Reconsideration of any cause or motion submitted on appeal shall be made in writing before the judgment or order of the court has been approved by the court and filed by the court with the clerk for journalization or within ten days after the announcement of the court' decision, whichever is the later [sic].

Ohio App.R. 26 (Anderson 1975). At that same time, Ohio App.R. 14(B) provided that "[t]he court for good cause shown may upon motion enlarge or reduce the time prescribed by these rules or by its order for doing any act, or may permit an act to be done after the expiration of such time...." Ohio App.R. 14(B) (Anderson 1975). The Ohio Supreme Court specifically noted in *Murnahan* that the state appellate rules as then written may be insufficient to provide the remedy set forth in its opinion. The Court stated:

[i]n light of the fact that Ohio has no statutory authority or court rules dedicated to the procedure to be followed by defendants who allege ineffective assistance of appellate counsel, we recommend to the Rules Advisory Committee appointed by this court to review whether an amendment to App.R. 14(B) or a new rule should be adopted to better serve claimants in this position.

*Id.* at 66 n. 6, 584 N.E.2d at 1209 n. 6.

Thereafter, in response to *Murnahan*'s directive, Ohio App.R. 26 was amended, effective July 1, 1993, permitting a defendant in a criminal case to apply for reopening the appeal from the judgment of conviction and sentence based on a claim of ineffective assistance of appellate counsel and requiring such application to be filed in the court of appeals where the appeal was decided "within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." Ohio App.R. 26(B)(1) (Anderson 1997).

Petitioner argues that the Hamilton County Court of Appeals' conclusion that his Application for delayed Reconsideration was not timely is in error because *Murnahan*, *supra*, had not even been decided when his case was on direct appeal. Petitioner cites to *State v. Rone*, App. No. C–920640, 1983 WL 5172, at *1 (Hamilton Cty. Ct.App. Aug. 31, 1983), for the proposition that there did not exist a firmly established procedure for raising ineffec-

---

**3.** In *Murnahan,* the Ohio Supreme Court specifically addressed a situation such as Petitioner's in which a petitioner requests delayed Reconsideration of the direct appeal in the court of appeals because "ineffective assistance of appellate counsel claims may be left undiscovered due to the inadequacy of appellate counsel or the inability of the defendant to identify such errors within the time allotted for Reconsideration in the court of appeals or appeal to this court." *Murnahan*, 63 Ohio St.3d at 65–66, 584 N.E.2d at 1209.

tive assistance of appellate counsel claims in the First Appellate District, let alone for raising an ineffective assistance of counsel claim based on facts outside the record. Additionally, Petitioner argues that the court of appeals ignored the fact that the same counsel that represented Petitioner on direct appeal were the same counsel he claims were ineffective. Furthermore, Petitioner asserts that he did attempt to raise the ineffective assistance of appellate counsel claim with the First Appellate District Court but was denied leave to do so. Thus, Petitioner asserts that *Rone* does not create a remedy at all or, even at the least, it does not create a remedy established by *Murnahan.*

Petitioner contends that the Ohio Supreme Court erroneously adopted these errors and omissions when it declined jurisdiction in his case. In essence, Petitioner asserts that he has been denied a forum for raising his ineffective assistance of appellate counsel claim in the state courts in violation of his constitutional rights.

The concern of this Court centers around whether the procedural rule actually enforced by the state court is an adequate and independent state ground given the then-existing state of Ohio law concerning that procedural rule. Respondent argues that *Rone* is an adequate and independent state ground upon which the Hamilton County Court of Appeals relied in denying Petitioner's motion for delayed Reconsideration. In *Rone*, the Hamilton County Court of Appeals held that ineffective assistance of appellate counsel claims were not cognizable in post-conviction proceedings. *Rone*, 1983 WL 5172, at *4. Although not a part of the holding of the case, the court purported to describe three alternative ways to raise the claim. Two of the methods were "merely illustrations" of other methods employed by other state jurisdictions. *See Combs v. Anderson*, C–1–95–733, at 153 (S.D.Ohio Oct. 21, 1997). With respect to the third method, the court stated, "[w]e are further convinced that the appellate court in which counsel

had been alleged ineffective could consider the issue upon a motion for Reconsideration of its own judgment." *Id.*

■ Contrary to Respondent's assertion, we hold that *Rone* is not an adequate and independent state ground for the following reasons. First, *Rone* did not clearly establish a procedure for raising a claim of ineffective assistance of appellate counsel. It did nothing more than conclude that ineffective assistance of appellate counsel claims could not be raised in post-conviction proceedings. *See Sowell v. Collins*, C–1–94–237, at 62 (S.D.Ohio Feb. 18, 1998) (holding that, upon reviewing *Rone*, there was no firmly established state procedure for raising ineffective assistance of appellate counsel claims prior to *Murnahan*). The *Rone* court merely suggested, without further guidance, the other means of raising a claim, but the court did not provide any analysis or consideration as to the viability of their suggestions. Despite its statement "there must be a viable means of recourse available to one who has been denied the effective assistance of appellate counsel," *Rone*, 1983 WL 5172, at *3, the court's suggested third remedy is hollow. Ohio App.R. 14(B)'s standard of "good cause" is too vague to alert a defendant as to a deadline beyond the ten days, and thus the rule does not give any reasonable certainty as to the procedure. The Ohio Supreme Court has recognized that often a defendant may not be able to identify without counsel the errors of his appellate counsel or the ineffectiveness of appellate counsel may not be discovered by a different attorney in the time allotted for motions to reconsider. *See Murnahan*, 63 Ohio St.3d at 65–66, 584 N.E.2d at 1209. The time constraints applicable to the *Rone* court's remedy do not take into account the considerations noted by the Ohio Supreme Court. And the *Rone* court did not explain how a defendant could either retain a new attorney within 10 days to challenge the effectiveness of appellate counsel or discover the ineffectiveness

while still represented by same appellate counsel within the time allotted.

More significantly, the Ohio Supreme Court in its decision in *Murnahan* specifically recognized the lack of any statewide appellate rules in 1992 to deal with the situation where a defendant does not discover an appellate ineffectiveness claim until after the time for moving to reconsider has expired. Thus, by the Ohio Supreme Court's own analysis, until amended Ohio App.R. 26 became effective in 1993, pursuant to its decision in *Murnahan*, there was no viable method of raising a claim of ineffective assistance of appellate counsel where the time for moving to reconsider had already expired. Moreover, *Rone* could not have established a viable system for raising ineffective assistance of appellate counsel claims as it was decided approximately ten years prior to *Murnahan* and the effective date of Ohio App.R. 26. Thus, *Rone*, did not establish a clear, viable method for alleging ineffective assistance of appellate counsel claims.

Secondly, *Rone* was not consistently applied by the Hamilton County Court of Appeals at the time Petitioner would have been expected to comply with the rule. The Hamilton County Court of Appeals confused the issue of how to raise ineffective assistance of appellate counsel claims by its decision three months after *Rone* in *State v. Campbell*, No. C–830221, 1983 WL 5302, at *1 (Ohio Ct.App. Nov.9, 1983). In *Campbell*, the court declined to apply *Rone* to an ineffective assistance of appellate counsel claim raised in a post-conviction petition. Instead, the court denied the claim on the grounds that it was not supported by evidentiary documents containing sufficient operative facts to demonstrate its validity. *Id.*

Thirdly, looking at the decisions of a number of Ohio courts of appeals and the Ohio Supreme Court, it is readily apparent that, prior to *Murnahan*, Ohio law was not firmly established as to how to raise a claim of ineffective assistance of appellate counsel. Moreover, until *Murnahan* was

decided in 1992, on a state-wide basis, the rules regarding how to raise an ineffective assistance of appellate counsel claim varied significantly. *Compare, e.g., State v. Howard*, 42 Ohio St.3d 18, 23, 537 N.E.2d 188, 193 (1989) (considering ineffective assistance of appellate counsel claim on post-conviction); *State v. Miller*, 44 Ohio App.3d 42, 43, 541 N.E.2d 105, 107 (Ohio App. 6 Dist.1988) (same); *State v. Sawyer*, No. CA85–12–160, 1986 WL 7116, at *2 (Ohio App. 12 Dist., June 23, 1986) (same); *State v. Kaldor*, No. 83–B–12, 1985 WL 10432, at *1 (Ohio App. 7 Dist., Apr.29, 1985) (same); *with, e.g., State v. Mitchell*, 53 Ohio App.3d 117, 119, 559 N.E.2d 1370, 1372 (Ohio App. 8 Dist.1988) (holding ineffective assistance of appellate counsel claims not cognizable on post-conviction); *State v. Fraley*, No. 88–AP–180, 1988 WL 55434, at *2 (Ohio App. 10 Dist., May 17, 1988) (stating same); *see also Manning v. Alexander*, 912 F.2d 878, 881–883 (6th Cir. 1990) (finding that by 1990 the Ohio Supreme Court had not spoken clearly as to how to initiate claims of ineffective assistance of appellate counsel and that Ohio law appeared to permit an ineffective assistance of appellate counsel claim to be raised in post-conviction); *Sowell, supra*, at 61 (concluding that prior to *Murnahan* the procedure in Ohio for raising ineffective assistance of appellate counsel claims was unsettled and citing *Manning* ); *Combs*, C–1–95–733, at 154 (recognizing that prior to *Murnahan* there was no procedure established *state-wide* to present ineffective assistance of appellate counsel claims) (emphasis in original).

Respondent seems to rely on the fact that a decision by the Hamilton County Court of Appeals is binding on Petitioner and therefore it does not matter what the state of the law was as determined by other Ohio courts of appeals. However, the Court is not convinced that, in analyzing the state procedural rules so as to determine whether they are adequate and independent state ground to bar federal habeas review, we should be concerned

only with the Hamilton County Court of Appeals decisions as opposed to the rules announced by the Ohio Supreme Court or state-wide appellate rules. For example, in determining the state of Ohio law in 1990 regarding how to raise ineffective assistance of appellate counsel claims, the Sixth Circuit did not look to only decisions of the court of appeals relevant to the petitioner in the case. Instead, the Sixth Circuit examined whether the Ohio Supreme Court had resolved the issue and to the fact that many courts of appeals were in conflict regarding the issue. *See Manning*, 912 F.2d at 881–883 (holding that petitioner had exhausted his state remedies and that he had adequately presented ineffective assistance of appellate counsel claim in a post-conviction petition); *see also Reed v. Scott*, 70 F.3d 844, 846 n. 18 (5th Cir.1995) (reviewing several state courts of appeals decisions to determine whether a state procedural rule was firmly established so as to be an adequate state ground to bar federal habeas review).

We recognize that our sister court in *Combs* held contrary to us, but we find that case distinguishable. In *Combs*, the Hamilton County Court of Appeals did not rely upon *Rone* in denying the petitioner's application for reconsideration, unlike what the court did in Petitioner's case here. In other words, *Rone* was not the procedural bar enforced by a state court that the district court had to determine whether it was an adequate and independent state ground. Rather, the court of appeals relied upon amended Ohio App.R. 26(B) because, unlike here, the petitioner's application was filed in 1994, after the effective date of the amendment to Ohio App.R. 26(B). Thus, the *Combs'* discussion of *Rone* is irrelevant to its holding. Moreover, even though the *Combs* court states in its conclusion that the Hamilton County Court of Appeals consistently applies *Rone*, none of the cases cited for support of the consistent application of *Rone* involve factual situations in which a defendant presents a claim of ineffective assistance of appellate counsel in a manner

suggested by *Rone*. Rather, the holding of *Rone* —that ineffective assistance of appellate counsel claims are not cognizable in post-conviction—is what is consistently applied by the courts. All of the cases cited in *Combs*, C–1–95–733, at 155, denied a claim of ineffective assistance of appellate counsel raised in post-conviction on the basis of *Rone*. Finally, in *Combs*, the court is not concerned with whether there was an adequate and independent rule established by the Ohio Supreme Court or followed state-wide. Instead, the court in *Combs* was concerned only with whether there was a rule serving the Hamilton County Court of Appeals. As we stated earlier, we are not convinced that our concern should be focused merely on the court of appeals as opposed to the rules announced by the Ohio Supreme Court or recognized state-wide by the appellate courts.

Accordingly, we conclude that there was no firmly established Ohio rule regarding how to raise ineffective assistance of appellate counsel claims prior to *Murnahan*. Petitioner filed his Application for delayed Reconsideration on November 23, 1992, pursuant to *Murnahan*, but before the amended Ohio App.R. 26 became effective in 1993. Therefore, the only procedural rule to which Petitioner was subject was *Murnahan*, and thus the issue before the Court is whether Petitioner complied with the procedure set forth in *Murnahan*.

■ The *Murnahan* Court directed Petitioner to Ohio App.R. 14(B) and 26 as the method for raising the ineffective assistance of appellate counsel claim in a motion for delayed Reconsideration. The court clearly indicated that those rules should be amended because of the difficulty in discovering and raising ineffective assistance of appellate counsel claims in time under the current rules. *Id.*, 63 Ohio St.3d at 66 n. 6, 584 N.E.2d 1204. Ohio App.R. 14(B), which governed the enlargement of time for filing a motion beyond the ten days from the original appellate judg-

ment, did not define "good cause." Moreover, neither the *Murnahan* decision nor Ohio App.R. 14(B) set an outer limit or absolute deadline that would have alerted Petitioner to a certain deadline for filing a *Murnahan* Application pursuant to the rule. Petitioner filed the *Murnahan* Application eight months after *Murnahan* was decided.

Given that there was no firmly established rule in *Murnahan* or in Ohio App.R. 14(B) that would have alerted Petitioner to file sooner than eight months after *Murnahan* was decided, we conclude that Petitioner did not procedurally default his ineffective assistance of appellate counsel claim by raising it in his *Murnahan* Application. *See Sowell,* C–1–94–237, at 64 (holding that petitioner did not violate procedure set forth in *Murnahan* by filing motion for delayed Reconsideration in court of appeals three months after the *Murnahan* decision). Accordingly, we find that the claim of ineffective assistance of appellate counsel is not waived and can be heard on the merits.

Nonetheless, in order to establish a constitutional violation of ineffective assistance of counsel, the petitioner must satisfy the standard set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). More specifically, the petitioner must show both that his counsel's representation fell below an objective standard of reasonableness and that his deficiencies prejudiced his defense. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052; *Bowen v. Foltz,* 763 F.2d 191, 194 (6th Cir.1985). First, the petitioner must show that his counsel's performance was deficient. *Id.* at 687, 104 S.Ct. 2052. In other words, that his counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment of the Constitution. *Id.* Secondly, the petitioner must show that his counsel's deficient performance prejudiced his defense. *Id.* A petitioner may establish the second "prejudice" prong of the *Strickland* test by showing that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 693–94, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.; see also Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir.1992); *Blackburn v. Foltz,* 828 F.2d 1177, 1180 (6th Cir.1987). If the petitioner fails to satisfy either of the two prongs of the *Strickland* formula, it cannot be said that his conviction and/or subsequent death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* at 687, 104 S.Ct. 2052.

Specifically, Petitioner asserts in his *Murnahan* Application that his appellate counsel was ineffective because they failed to raise the issues that: (1) his conviction for attempted rape was against the manifest weight of the evidence; (2) the trial court erred by instructing the jury to consider death before commencing deliberation of either of the two life imprisonments sentences; (3) his trial counsel was ineffective during the *voir dire,* trial, and sentencing stages of the proceedings; (4) trial court erred in admitting evidence that allowed the jury to consider non-statutory aggravating circumstances and weigh them against the mitigating factors established during the sentencing hearing; (5) The multiplicitous indictment returned in this case combined with the supplemental jury charge offered by the court during the trial phase of the deliberations was in violation of his constitutional rights; (6) the prosecutor used his peremptory challenges in a discriminatory manner; (7) the prosecutor used his peremptory challenges to exclude all jurors who expressed any scruples about the death penalty; (8) the policies and procedures employed by the Hamilton County prosecutor's office in seeking and securing capital convictions and death sentences violated Petitioner's constitutional rights; (9) the appellate re-

view conducted by the state courts was incomplete and failed to ensure that Petitioner's sentence was not arbitrarily and capriciously applied; (10) the prosecutor's actions of consistently calling for the jury to seek justice for the community was a violation of his constitutional rights; (11) the constitutionally mandated appellate review was conducted through reliance upon an incomplete record; and, (12) the prosecutor introduced evidence of the personal characteristics of the victim at trial and sentencing phase of the proceedings.

■ While the Court recognizes that, in effectuating the goal of "vigorous and effective advocacy," the attorney need not advance every argument on appeal, regardless of merit, that is pointed out by the appellant in noncapital cases, *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), we believe that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution. In other words, we believe that the advice espoused by Chief Justice Burger in *Jones*—namely that the appellate counsel's duty is not to raise every "colorable" argument, but focus on one central issue if possible or at most a few key issues—is not pragmatic in light of the high stakes involved in capital case.

■ Moreover, it is Chief Justice Burger who reminds us in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that there is a "qualitative difference" between the death sentence and other penalties. *Id.* at 604, 98 S.Ct. 2954 ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). The difference that Chief Justice Burger intimated in *Lockett* certainly should apply to the manner in which counsel approach a capital case on appeal. In capital cases, appellate counsel should be cautious in winnowing out claims and asserting only those claims that *they* perceive are the best of those that are available. This does not mean that counsel on appeal should raise frivolous issues that are clearly without merit. Simply put, counsel on appeal should assert every conceivable claim that possesses some merit and some support in the trial record. This approach should be followed because: (1) like any case on direct appeal—issues abandoned by counsel cannot be reclaimed later, and (2) the stakes are much higher in capital than non-capital cases.

■ Reviewing the record, we conclude that the failure of Petitioner's appellate counsel to raise the claims presented in his *Murnahan* Application constitutes cause as established in *Strickland*. Nevertheless, we conclude that Petitioner fails to demonstrate that, but for his counsels' failure in bringing these claims, the overall outcome of the appellate court would have been different. Thus, Petitioner fails to undermine our confidence in the overall outcome of the appellate proceedings. Accordingly, we find that Petitioner's claim of ineffective assistance of appellate counsel is without merit, and, thus, DENIED.

## C. OTHER CLAIMS RESPONDENT ASSERTS WERE PROCEDURALLY DEFAULTED

### CLAIM 2(A):

**Petitioner Henderson's conviction for attempted rape and the death penalty specification of attempted rape are against the manifest weight of the evidence in violation of the Fifth, Sixth, and Eighth and Fourteenth Amendments to the United States Constitution.**

Petitioner asserts in this claim that his conviction of attempted rape and the conviction of aggravated murder during the course of an attempted rape and the accompanying specification that the aggravated murder was committed during the course of an attempted rape are against the manifest weight of the evidence.

In contrast, Respondent argues that this claim has been waived because the claim was not raised in state courts. Instead of raising the claim that the death specification and his conviction for attempted rape are against the manifest weight of the evidence in the state courts, Respondent asserts that Petitioner merely attacked the sufficiency of the evidence. This is an entirely different claim according to Respondent. Respondent also argues that Petitioner cannot prove cause and prejudice existed for not raising this claim.

 In order for the district court to consider a federal habeas petitioner's claim, the petitioner must have "fairly presented" to the state courts the "substance" of the federal habeas corpus claim. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). A petitioner cannot simply make a bare assertion in his federal habeas review that all of the facts necessary to support the federal claim were before the state court or that "a some-what similar state-law claim was made." *Id.* Failure of a petitioner to raise a claim on direct appeal or in the Ohio Supreme Court constitutes procedural default, and, thus a waiver of his claim for federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Leroy,* 757 F.2d at 97.

 In the instant matter, Petitioner did not fairly present this claim in the state courts. On direct appeal, Petitioner asserted as his Second Assignment of Error that the issue for review was "[w]hether proof that a victim was killed while she was naked is sufficient to prove that her killer attempted to rape her" (*See* Appendix to R.O.W., Vol. I, Ex. D at 11). In his appeal to the Ohio Supreme Court, Petitioner asserted in his Proposition of Law No. 3 that the evidence of Ms. Acoff being killed while naked was insufficient to prove that her killer attempted to rape her. (*Id.,* Ex. G at 16). Petitioner raised this claim for the first time in his post-conviction

petition as his Second Cause of Action. However, the state court barred this claim on *res judicata* grounds. Barring a claim based on *res judicata* normally constitutes an adequate and independent state ground precluding federal habeas corpus review of Petitioner's claim.

In his Petition, Petitioner now intertwines his argument regarding the sufficiency of the evidence with his argument that the conviction was against the manifest weight of the evidence in an attempt to bolster his argument that they are the same claim. However, even though Petitioner would have one believe that his sufficiency of the evidence claim raised in his brief to the court of appeals and Ohio Supreme Court is so similar to the instant claim that this Court should find that he did present the claim in the state courts, we disagree. Thus, because Petitioner failed to present this claim to the state courts, this Court may not consider the claim absent a showing of cause and prejudice by Petitioner. *Wainwright,* 433 U.S. at 87, 97 S.Ct. 2497; *Leroy,* 757 F.2d at 97. In his Traverse, Petitioner provides nothing in support of an argument for cause for his failing to raise this claim in the state courts. Although Petitioner maintains that the ineffective assistance of his appellate counsel is cause for failing to raise this claim, as we stated, Petitioner fails to satisfy the second prong of the *Strickland* analysis to sustain such an assertion. Finding that Petitioner failed present this claim to the state courts, and that a "fundamental miscarriage of justice" will not occur by not considering this claim, we conclude that part 2(A) of Petitioner's second claim for relief is hereby waived.

*CLAIM 8:*

**The trial court's instructions to the jury at the sentencing phase of the proceedings advised the jury that they must consider death first before commencing deliberation on either of the two life verdicts. This instruction is fundamentally unfair, and violates the**

Fifth, Sixth, and Eighth and Fourteenth Amendments to the United States Constitution.

In his eighth claim for relief, Petitioner contends that the trial court's instructions to the jury at the penalty phase, namely that they must first consider death before addressing either of the two possible life verdicts under Ohio Rev.Code § 2929.03(D)(2), was erroneous. While Petitioner acknowledges in his Traverse that the instruction given by the trial judge in his case was modeled after the Ohio pattern jury instructions, he asserts that the instruction was partial and biased in favor of death. Petitioner asserts that the error in the initial instruction was then compounded by the trial judge's supplemental *Allen* charge[4] to the jury, discussed *infra* Section C, claim 9, which Petitioner argues resulted in him ultimately being sentenced to death.

Petitioner did not raise this claim on direct appeal or during his appeal to the Ohio Supreme Court. The only claims that were raised that are similar, albeit not to the point of being considered "fair presentations" of this claim, include his Fourteenth Assignment of Error in his direct appeal brief and his Proposition of Law No. 9 in his brief to the Ohio Supreme Court. In these claims, Petitioner sought relief based on the trial court sending the jury back to deliberate after giving an *Allen* charge.

The first time Petitioner raises this exact claim is in his post-conviction petition as his tenth cause of action. · However, the court barred Petitioner's claims under the doctrine of *res judicata*. Other than through a demonstration of cause and prejudice, we do not believe that the state court's finding should be disturbed.

*Wainwright,* 433 U.S. at 87, 97 S.Ct. 2497. In his Traverse, Petitioner makes no showing of cause for his failure to present this claim to the state courts. Petitioner also fails to show that the Court's failure to consider this claim will result in a "fundamental miscarriage of justice." We therefore conclude that Petitioner's eighth ground for relief is hereby waived.

*CLAIM 10:*

Petitioner Henderson was denied a fair trial, due process, equal protection of the law and the effective assistance of counsel at the voir dire stage of his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In Petitioner's tenth ground for relief, he cites nine (9) areas in support of his assertion that he was denied effective assistance of counsel during the *voir dire* stage of the proceedings. Those areas include:

(1) the trial court refused the appointment of co-counsel even though it was standard practice in the State of Ohio at the time to appoint two attorneys to represent an indigent defendant in a capital case;

(2) trial counsel failed to object to the hardship excusal of twenty (20) jurors with the end result being that potential jurors were drawn from a general pool;

(3) trial counsel failed to object to Petitioner being in prison clothing during *voir dire;*

(4) trial counsel failed to rehabilitate five (5) jurors for cause;

(5) the trial judge limited *voir dire;*

(6) the trial judge berated counsel in front of the jurors;

---

4. The Allen charge, or "dynamite charge," derives its name from the Nineteenth Century case *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the Supreme Court upheld the use if jury instructions that instruct minority jurors to ponder their own convictions and give considerable weight to the opinions of the majority. *Id.* at

501, 17 S.Ct. 154. Thus, the Allen charge is seen as an instruction primarily intended to cause an otherwise deadlocked jury to reach a verdict. We note that even though *Allen* has never been overruled or modified by the United States Supreme Court, it has been seriously criticized by lower courts.

(7) trial counsel failed to challenge potential jurors Sharon Mullin, Allen Rupard, and Ronald Meridy;

(8) trial counsel failed to exercise all twelve (12) of his peremptory challenges;

and,

(9) the trial court's denial of the psychiatric evidence hurt trial counsel's performance.

In the Return of Writ, Respondent concedes that Petitioner properly asserted the first, fifth, sixth, and ninth contentions of this claim, and therefore these contentions can be heard on the merits. However, Respondent maintains that the second, third, fourth, seventh, and eighth contentions are procedurally defaulted. As we stated earlier, our primary concern in this section is with those claims and contentions Respondent argues are procedurally defaulted. Consequently, the first, fifth, sixth, and ninth contentions of this claim will be dealt with later in section C.

■ Having reviewed the claims asserted on the record in the state court proceedings, we recognize that Petitioner did not raise these issues on direct appeal, in his appeal to the Ohio Supreme Court, or as causes of actions in his post-conviction petition. While Petitioner maintains that his counsel on appeal was ineffective, and that ineffectiveness constitutes cause for his failing to raise the claim in the state courts, we conclude that he has not shown that his proceedings were prejudiced by his counsel deficiencies. Moreover, we conclude that Petitioner cannot demonstrate that he was prejudiced by this claim not being raised in his state court proceedings. Furthermore, we do not believe that a fundamental miscarriage of justice will occur if this Court does not consider Petitioner's claims. Accordingly, we conclude that the second, third, fourth, seventh, and eighth claims under Petitioner's tenth ground for relief have been waived.

**CLAIM 10(A):**

**Petitioner was denied the effective assistance of counsel at his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner also asserts that he was denied effective assistance of counsel at his trial in violation of his constitutional rights. Specifically, Petitioner asserts that his counsel was ineffective in the following ways:

(1) the trial court failed to appoint co-counsel even though it was standard practice in the State of Ohio at the time to appoint two attorneys to represent an indigent defendant in a capital case;

(2) trial counsel failed to have a psychological evaluation conducted of Petitioner and also failed to prepare for mitigation;

(3) trial counsel failed to give an opening statement and preserve his right to do so;

(4) trial counsel failed to file a motion in limine or object to the testimony of Joann Acoff;

(5) trial counsel failed to object to the trial court's *voir dire* of Joann Acoff in front of the jury;

(6) trial counsel failed to request an opportunity to *voir dire* Joann Acoff to establish her competency to remember and tell the truth;

(7) trial counsel failed to object to the testimony of Shirley Acoff;

(8) trial counsel failed to move that the hearsay testimony of Shirley Acoff be stricken and failed to raise the issue prior to the trial by a motion in limine;

(10) trial counsel failed to move that the statements of James Martin be stricken and failed to raise the issue prior to trial by a motion in limine;

(11) trial counsel failed to move that the hearsay statement of officer Thomas Cameron be stricken;

(12) trial counsel failed to cross-examine officer Cameron;

(13) trial counsel failed to adequately prepare for and conduct the cross-examination of state serologist Barbara Heizman;

(14) trial counsel failed to request funds from the court to hire a psychologist or psychiatrist;

(15) trial counsel failed to precisely lay out for the trial court areas of insufficient evidence in the motion for acquittal;

(16) trial counsel failed to object to inflammatory statements by the state;

(17) trial counsel failed to object to the trial court's jury instructions to bootstrap attempted rape on aggravated burglary;

(18) trial counsel failed to object to the *Allen* charge by the trial court;

(19) trial counsel failed to object to the submission of the attempted rape instruction;

(20) trial counsel failed to object to the court's repeated instruction that the jury's sentence was only a recommendation;

and,

(21) trial counsel failed to object to the aggravating circumstances on the aggravated burglary charge.

In the Return of Writ, Respondent submits that Petitioner presented the first, second, eighteenth, nineteenth and twentieth issues of ground 10(A) to the state courts. Thus, we will address these claims separately in our merits review. However, we note that the other claims were not raised in the state courts and therefore are procedurally defaulted. Moreover, a review of the record shows Petitioner did not present any of these claims in the state courts. While he has asserted that his appellate counsel was ineffective, and, that ineffectiveness constitutes cause for his failing to bring these claims, we disagree that his appellate proceedings were prejudiced by his counsel deficiencies. Moreover, we conclude that Petitioner cannot demonstrate that he was prejudiced by

this claim not being raised in his state court proceedings. Finding that a fundamental miscarriage of justice will not occur by not addressing these claims, we hereby REJECT issues 3–17 and 21 of claim 10(A) in his Petitioner's Petition for a Writ of Habeas Corpus.

### *CLAIM 10(B):*

**Petitioner was denied a fair trial, due process, and equal protection of the law as well as the effective assistance of counsel at the penalty phase of his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Next, Petitioner asserts that he was denied effective assistance of counsel at the penalty phase of the trial due to a number of errors by the trial court and his counsel. Specifically, Petitioner asserts that his constitutional right to effective counsel at the penalty phase was violated by:

(1) the denial by the court to appoint co-counsel;

(2) denial by the court to authorize funds for Petitioner to employ a psychiatrist or psychologist in preparation of defense or mitigation;

(3) denial by court to defense counsel's request for a two week continuance;

(4) trial counsel's inability to effectively communicate with Petitioner;

(5) trial counsel's opening statement was brief and pointless;

(6) trial counsel presented only the testimony of Petitioner, Petitioner's grandmother, aunt, and brother;

(7) trial counsel failed to present any psychological or psychiatric testimony to explain Petitioner's behavior on the night in question;

(8) trial counsel failed to conduct any investigation into Petitioner's history;

(9) trial counsel failed to object to any of the prosecuting attorney's closing arguments;

(10) trial counsel failed to object to the jury being allowed to separate and go home for the night in the middle of

deliberations in contravention to Ohio law;

(11) trial counsel failed to object to the court's giving of the supplemental *Allen* charge; and,

(12) trial counsel failed to support and argue Petitioner's *pro se* motion for a new trial.

Petitioner further argues that the jury was given no guidance by defense counsel as to why they should not sentence him to death. Specifically, Petitioner maintains that if his counsel had been given the resources requested, he would have conducted a reasonable investigation and the jury would have been presented with the following mitigation evidence:

Jerome Henderson is presently a 30 year old Black male. He was born in Montgomery, Alabama on January 29, 1959. His mother died during his childbirth leaving Jerome and his five siblings to be raised by their maternal grandmother, Minnie Lee Elsberry. To this day, Jerome feels responsible for his mother's death. He has never been told the cause of death. According to Jerome, he was raised in a loving household. Everyone had chores and responsibilities. Both grandparents disciplined the children using a broom handle as a paddle.

Jerome's biological father, Jesse Henderson, Sr., was sentenced to 20 years in prison for murder in Florida. Jerome briefly reunited with him upon his father's release, but has had essentially no contact with him.

Jerome attended public schools and participated in sports (wrestling, football) in high school. He worked part time at the Elder–Beerman Department store. He quit school in the 12th grade in order to work more hours. He worked for the Chessie Railroad from 1979 until his arrest in 1985. Prior to Jerome's incarceration he showed a remarkably good work record compared to other capitally charged defendants.

Jerome has had little involvement with drugs and alcohol. He stated that he would buy drinks for his friends, but rarely consumed alcohol himself. Jerome's medical history reveals a gunshot wound in 1982 which occurred during an argument with a merchant over a box of Cracker Jacks. Jerome claimed that the Cracker Jacks were stale, but the store owner would not refund his money. He was also seen in the University of Cincinnati Hospital Emergency Room in 1982 for a penile abrasion resulting, according to Jerome, from intercourse.

Jerome has had difficulty in relationships with women for most of his adult life. He has been charged with domestic violence on several occasions. He has described himself as jealous, possessive, and obsessive with women. He could not tolerate his girlfriends looking at other men. This kind of pathological jealousy suggests serious impairment in relationships with women perhaps stemming from his unresolved feelings of abandonment by his own mother.

On the Wechsler Adult Intelligence Scale—Revised (WAIS–R), Jerome scored a verbal IQ of 96. This places him in the average range of intelligence. The verbal scores are somewhat higher than those tested by Dr. Schmidtgoessling (IQ 85) in July of 1985. The performance scores are the same as those tested previously. Current testing reveals a pattern of introtest scatter noted previously by Dr. Schmidtgoessling. He misses easy items, but passes more difficult ones. In the area of verbal comprehension (which measures social judgment), Jerome's responses indicate that though his intellectual capacity is at least average, he tends to make poor decisions given his ability. On performance tests, the results indicate that Jerome is keenly aware of his environment and very sensitive to any changes. He records near perfect scores on Picture Completion (a test designed to measure visual alertness and the ability to

differentiate between essential and non-essential details). However, on Picture Arrangement (a test designed to measure nonverbal reasoning and planning ability), Jerome's scores are somewhat lower. This suggests to me that though Jerome is keenly aware of his environment, he tends to respond without adequate planning or reasoning. In my opinion, the test results are a valid indication of his overall intellectual ability.

On the Minnesota Multiphasic Personality Inventory (MMPI), Jerome's test taking attitude is extremely guarded. He appears rigid, moralistic, and guarded. His profile appears to be that of a very defensive individual whose main ego defense mechanisms are repression and denial. He appears to have little awareness of the consequences to other people of his own behavior. This kind of profile is typical of paranoid individuals.

On the Rorschach Inkblot Test, Jerome's responses are quite limited in number. He shows good form quality on the early cards, but his form quality deteriorates as the cards become more complex. Jerome's profile is typical of individuals who are able to handle routine tasks quite well, but tend to become quite anxious and emotional (explosive) when the situation becomes stressful.

Based on the results of the psychological evaluation clinical interviews, and review of the various records, it is my opinion that Jerome Henderson is suffering from a paranoid personality disorder. He meets the diagnostic criteria for this disorder listed on page 339 of the Diagnostic and Statistical Manual of Mental Disorder (3rd Ed.Rev.). This disorder began during his childhood years and remains his predominant personality style. Paranoid individuals expect to be exploited by others, question the loyalty of close friends, bear grudges for long periods of time, question the fidelity of sexual partners, and have difficulty confiding in others for rear [sic] that the information will be used against them.

Pathological jealousy is also an important feature in many paranoid individuals. All of these factors are true for Jerome Henderson. Absolute trust is often a requirement in relationships which logically results in great disappointment, frustration, and anger.

Paranoid individuals prefer rules and structure. His paranoid personality disorder provides a frame of reference towards the rest of the world. Unfortunately, this frame of reference is incorrect as are the prevailing beliefs and expectations that result from this perspective. He distrusts most people, including those working on this petition. Paranoid individuals typically follow a pattern of defensiveness that includes denial, projection, rationalization, and reaction formation (a justification for actions combined with a denial of wrongdoing). Jerome presents all of these defenses. Given this profile, Jerome's relationships with women are likely to be greatly distorted with resulting violence or threats of violence distorted with resulting violence or threats of violence when Jerome perceives (misperceives) disloyalty. In my opinion, much of Jerome's problems with women stem from an inadequate and underdeveloped sense of personal identity. Though he is intelligent and physically impressive, he functions much like a tragic figure who views the world as a threatening and hostile place. This, in spite of the fact that he actually had much going for him at one time and possesses many qualities which many defendants lack. This certainly does not excuse Jerome for his culpability. It appears that in certain situations with women, his personality disorder reaches a pathological, almost delusional level, in which reason and rational thinking disappear. His denial of his involvement is consistent with the dynamics of the paranoid personality disorder.

(*See* doc. 4: Petition for Habeas Corpus at 77–80 (referring to the Affidavit of James R. Eisenberg, Ph.D.)).

Upon review of the record, we agree that, aside from the claims Respondent concedes were presented to the state courts (1, 2, 3, 8 & 11), the other claims were not raised, and, thus, are procedurally defaulted pursuant to *Wainwright*, 433 U.S. at 87, 97 S.Ct. 2497. We do not believe that Petitioner has demonstrated that his counsel on appeal was ineffective to constitute cause for failing to raise these claims in the state courts. Furthermore, he cannot demonstrate that he was prejudiced by these claims not being raised in his state court proceedings. Finding that a fundamental miscarriage of justice will not occur if this Court does not consider this claim.

We also find unpersuasive, if not speculative, Petitioner's assertion that the jury would not have recommended the death penalty if it had been able to hear testimony similar to that in Dr. Eisenberg's affidavit. Accordingly, the fourth, fifth, sixth, seventh, ninth, tenth, and twelfth issues for relief under Claim 10(B) are hereby REJECTED for lack of merit. Petitioner's first, second, third and eighth issues for relief under claim 10(B) will be dealt with in the merits review of this Order.

*CLAIM 11:*

**The trial court admitted evidence of and allowed the jury to consider nonstatutory aggravating circumstances and weighed them against the mitigating factors established during the sentencing hearing. The presence of non-statutory aggravating circumstances during the sentencing process gives rise to an unacceptable risk of an arbitrary and capricious sentencing decision in violation of the Eighth Amendment as well as related violations of the Fifth, Sixth, Eighth [sic] and Fourteenth Amendments.**

Petitioner asserts in his eleventh claim for relief that the trial court's instructions to the jury at the sentencing phase of the proceeding allowed the jury to consider the nature of the crime itself and then afford it weight during the balancing of the aggravating and mitigating circumstances. Consequently, Petitioner contends that the trial court's instructions made the "heinousness of the offense" a new aggravating factor in the balancing process. Petitioner argues that, in essence, the trial court's actions undermined the reliability of the sentencing process in violation of his constitutional rights.

Respondent counters that, even though this claim was raised on direct appeal in Petitioner's thirteenth assignment of error, the claim was raised on the grounds of "prejudicial error" (Appendix to R.O.W.App., Vol. I, Ex. D at 42). Respondent argues in the alternative that, regardless of the claim being brought on direct appeal, Petitioner waived the claim because he failed to subsequently raise the claim to the Ohio Supreme Court.

 A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir.1990). Moreover, as we stated earlier, a petitioner who fails to present a claim on direct appeal or in the Ohio Supreme Court is deemed to have procedurally defaulted his claim unless he can demonstrate cause for the procedural default. *Leroy*, 757 F.2d at 97, 99–100. Thus, this Court finds Respondent's argument persuasive in that, even though Petitioner did "fairly present" this claim on direct appeal, he failed to raise it to the Ohio Supreme Court. *See id.* Petitioner does not demonstrate any cause for his failure to raise the claim to the Ohio Supreme Court, and this Court will not impute cause. Furthermore, Petitioner has not demonstrated that the failure by this Court to consider his eleventh claim for relief will result in a "fundamental miscarriage of justice." Accordingly, this Court ·is precluded from reviewing the merits of this claim as it is deemed waived.

## CLAIM 12:

**The multiplicitous indictment returned in this case combined with the supplemental jury charge offered by the court during the trial phase of deliberations violates the Fifth Amendment Double Jeopardy Clause and created an unacceptable risk of arbitrary and capricious death verdicts thereby offending the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

■ In his twelfth claim for relief, Petitioner asserts that the indictment against him constitutes a multiplicitous indictment enabling single courses of conduct to be split by the State and then bootstrapped to other charges to enhance the crime. Specifically, Petitioner contends that the intent to commit the rape was also used as the intent necessary to constitute the aggravated burglary. Thereafter, Petitioner asserts the offense of aggravated burglary was erroneously elevated from murder to aggravated felony murder which served as the aggravating circumstance necessary to elevate the case to the level of a capital offense. Petitioner maintains that this is erroneous because aggravated burglary is charged out as a separate count in the indictment, and, thus, resulted in double jeopardy in violation of his constitutional rights (*See* Petition at 84–85). However, Petitioner did not submit this claim in the state courts. Rather he submitted a claim similar, but it was brought only on grounds of state law. Finding that Petitioner failed to raise this claim in the state courts, we conclude that it has been procedurally defaulted.

## CLAIM 14:

**The discriminatory use of peremptory jury challenges by the State of Ohio violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

In his fourteenth claim for relief, Petitioner contends that, during the jury selection, the prosecutor exercised three peremptory challenges to excuse African–Americans from the jury. Petitioner asserts that when defense counsel objected to the challenges of each of the potential jurors as discriminatory, the prosecutor's only explanation was that the victim, Ms. Acoff, was also African–American. Petitioner maintains that the prosecutor's use of its peremptory challenges not only systematically stripped the jury of any African–Americans in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), but also resulted in a death-prone jury in violation of his constitutional rights.

However, Petitioner did not raise this claim in either his direct appeal or his appeal to the Ohio Supreme Court. Petitioner raised this claim for the first time in his post-conviction petition as his twelfth cause of action. The court noted in its post-conviction order that:

During *voir dire* when an issue concerning the use of peremptories occurred, the trial court ruled:

I don't know any reason for such a thing to be said so publicly, Mr. Shea. I don't think there's any indication, the record does not indicate that the prosecution is attempting to be prejudicial in its use of peremptory excuses. I want the record to show that.

And they have, just as you have used your peremptory excuses, I think you've used them logically. Just as they have used their peremptory excuses, I think that they have used theirs logically. (T.P. 362)

(Appendix to R.O.W., Vol. II, Ex. R at 16). The court then barred Petitioner's twelfth cause of action on the grounds of *res judicata*. The doctrine of *res judicata* is an independent and adequate ground upon which a state may preclude the court from addressing a constitutional claim. Accordingly, Petitioner must show cause why he

failed to present this claim to the state courts.

Having found that Petitioner's appellate counsel was not ineffective under our review of Petitioner's claims in his *Murnahan* Application, we find that Petitioner lacks "cause" to remove the bar of procedural default. We need not determine whether he suffered any actual prejudice. Furthermore, we do not believe that a fundamental miscarriage of justice will occur if we do not address Petitioner's claim that the peremptory challenges were violative of his constitutional rights. Accordingly, this claim is dismissed as being without merit.

### CLAIMS 17(A) & 24:

**The appellate review conducted by the state appellate court and Ohio Supreme Court was incomplete and failed to ensure that Petitioner's sentence was not arbitrarily and capriciously applied. Petitioner's sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

**Petitioner Henderson's sentence of death is in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the constitutionally mandated appellate review was conducted through reliance upon an incomplete record.**

Petitioner asserts in both of these claims that the appellate review was incomplete as well as based on an incomplete record in violation of his constitutional rights. Specifically, in claim 17(A), Petitioner maintains that the review of the appropriateness of the death penalty was not done thoroughly enough by the court of appeals and the Ohio Supreme Court because there were a number of unrecorded trial court proceedings and exhibits and photographs missing from the record.

Petitioner also asserts that his counsel on appeal was ineffective and that ineffectiveness constitutes cause for his failing to raise the claim in the state courts. However, we conclude that he has not shown that his proceedings were prejudiced by his counsel's deficiencies. Moreover, we conclude that Petitioner cannot demonstrate that he was prejudiced by this claim not being raised in his state court proceedings. Furthermore, we do not believe that a fundamental miscarriage of justice will occur if this Court does not consider Petitioner's claims. Therefore, we find no cause for having failed to raise this claim. Accordingly, this claim is dismissed as being waived by Petitioner.

### CLAIM 19:

**Petitioner Henderson was deprived of a fair trial, due process, and equal protection of the law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution due to the consistent calls by the prosecuting attorney to seek justice for the community and the consistent denigration of the constitutional rights of the Petitioner.**

In his nineteenth claim for relief, Petitioner asserts that throughout the *voir dire* and trial proceedings the prosecuting attorney engaged in a pattern of denigrating Petitioner and using statements to inflame the passion and prejudice of the jury. Petitioner asserts that the jury was inflamed by the prosecution's remarks and convicted and sentenced him to death.

Respondent asserts that this claim has been defaulted by Petitioner because he failed to present it to the state courts.

A review of the record reveals that Petitioner did not raise this claim on direct appeal or to the Ohio Supreme Court. Furthermore, Petitioner did not present this claim in his post-conviction petition. In his Traverse, Petitioner fails to demonstrate cause for his procedural default of this claim. Additionally, we do not believe that a fundamental miscarriage of justice will occur if the claim is not addressed by the Court. Nevertheless, even assuming that this Court found Petitioner's appellate counsel was ineffective and that ineffec-

tiveness was the cause for the procedural default of his claim, Petitioner fails to show that he was actually prejudiced by the trial remarks. For the reasons set forth in our discussion of this claim earlier in this opinion, we hereby conclude that this claim is without merit. Thus, Petitioner's nineteenth ground for relief for relief is hereby denied.

**CLAIM 25:**

**Petitioner Henderson was denied his right to a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by the State of Ohio introducing evidence of the personal characteristics of the victim at the trial and sentencing phase of the proceedings.**

In his twenty-fifth claim for relief, Petitioner asserts that throughout the trial and sentencing phase of the proceedings the prosecutor continuously introduced evidence related to the character of Ms. Acoff and that of her family. Petitioner argues that this evidence had no bearing on his guilt or innocence nor was it relevant to the sentence that the jury imposed. Petitioner submits that the introduction of victim character evidence and the evidence relating to Ms. Acoff's family background was nothing more than an under-handed ploy by the prosecutor to secure a conviction and death sentence.

Respondent asserts that Petitioner failed to present this claim in the state courts and thus this Court is precluded from hearing the claim because it has been waived.

We find that this claim has also been procedurally defaulted by Petitioner. First, Petitioner did not raise the claim on direct appeal, on appeal to the Ohio Supreme Court, or in his post-conviction petition. Secondly, Petitioner fails to demonstrate any cause as to why he procedurally defaulted this claim. Thirdly, no fundamental miscarriage of justice will occur by not addressing this claim on the merits.

As we stated earlier, even assuming that Petitioner's appellate counsel was ineffective and that is cause for the procedural default of his claim, Petitioner makes no showing that he was actually prejudiced by the state's introduction of the personal character of Ms. Acoff. Moreover, for the reasons set forth in our discussion of this ground earlier in this opinion, we hereby conclude that this ground is without merit.

**CLAIM 26:**

**Petitioner is entitled to have his conviction and sentence set aside due to the unconstitutionality of the Ohio death penalty statutes, sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05. These sections and the entire death penalty scheme in Ohio are repugnant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, sections 1, 2, 5, 9, 10, and 16, of the Ohio Constitution.**

Petitioner asserts a number of separate claims in his twenty-sixth claim for relief, many of which Respondent concedes can be heard by the Court on the merits. Of Claim 26, Respondent argues that 26, 26(C)(2), 26(C)(2)(a), 26(C)(2)(b), 26(C)(3), 26(C)(4), 26(C)(5), 26(C)(6), 26(C)(7) have been procedurally defaulted by Petitioner. On the other hand, Respondent argues that 26(A), 26(A)(1), 26(A)(1)(a), 26(A)(1)(b), 26(A)(1)(c), 26(B), 26(B)(1), 26(B)(2), 26(B)(3), 26(B)(a), 26(B)(3)(b), 26(B)(3)(c), 26(E)(3)(d), 26(B)(4), 26(B)(5), 26(B)(6), 26(C), 26(C)(1), 26(D), 26(E) have not been waived by Petitioner. In accordance with this Order, we will first address the claims Respondent asserts have been procedurally defaulted and then we will address the claims that can be heard on the merits.

In the Return of Writ, Respondent argues that Petitioner failed to present subclaims 26 and 26(c)(2) through 26(c)(7) to the state courts. Accordingly, Respondent asserts that these claims have been procedurally defaulted. These claims include:

26: Petitioner is entitled to have his conviction and sentence set aside due to the unconstitutionality of the Ohio death penalty statutes, sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05. These sections and the entire death penalty scheme in Ohio are repugnant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 2, 5, 9, 10, and 16, of the Ohio Constitution.

26(c)(2): The Ohio "beyond a reasonable doubt" standard of proof fails to meet the requirement of higher reliability for the guilt determination phase of a capital case.

26(c)(2)(a): The appropriate burden of proof in a capital case should be proof beyond all doubt.

26(c)(2)(b): In the alternative, proof to a moral certainty should be required.

26(c)(3): Requiring proof of the aggravating circumstances during guilt reduces the reliability of the guilt determination procedure thereby violating due process and causing arbitrary and capricious results.

26(c)(4): The vagueness of sections 2929.03 and 2929.05 relating to the weighing of aggravating circumstances and mitigating factors leads to an arbitrary imposition of the death penalty.

26(c)(5): Lack of complete certainty about guilt must be considered as a factor in mitigation of sentence.

26(c)(6): The Ohio death penalty statute impermissibly mandates imposition of death upon proof that an aggravating circumstance merely outweighs any evidence in mitigation.

26(c)(7): The statutes fail to require the state to prove the absence of any mitigating factors and that death is the only appropriate penalty.

Reviewing the Petitioner's briefs on direct appeal and to the Supreme Court of Ohio, we agree with Respondent that Petitioner failed to present any of these claims to the state courts. Furthermore, Petitioner has not demonstrated any cause for failing to raise any of these claims in the state courts. We also find that a fundamental miscarriage of justice will not occur if the Court refuses to review Petitioner's claims. Therefore, we conclude that Claims 26 and 26(c)(2) through 26(c)(7) are procedurally defaulted.

## D. CLAIMS THAT MUST BE ADDRESSED ON THE MERITS

Having considered each of the claims that Respondent asserts were waived, we will now consider those remaining grounds that may be heard on the merits. These claims include: Claims 1, 2, 3, 4, 5, 6, 7, 9, 16, 17, 18, 20, 21, 22, and 23. Additionally, we note that there are separate claims in Claims 10, 10(A), 10(B), and 26 that must also receive a merits review by this Court.

### CLAIM 1:

**Petitioner's right to due process and to an impartial jury were violated when his challenge for cause to juror Andrea Pferrman was overruled by the trial court in violation of the Fifth, Sixth, and Eighth and Fourteenth Amendments to the United States Constitution.**

In his first claim for relief, Petitioner argues the trial court's failure to remove potential juror Andrea Pferrman for cause violated his due process right to an impartial jury. Petitioner asserts that the answers given by Ms. Pferrman during the *voir dire* clearly evidenced her bias toward him. As a consequence of her alleged bias, Petitioner contends that he sought to have her removed for cause. However, the trial judge denied the request. Petitioner contends that he was then forced to use one of his peremptory challenges to excuse Ms. Pferrman. Petitioner argues that, had the trial judge excused Ms. Pferrman for cause, he would have used his last peremptory challenge to excuse potential juror James Nickerson.

Petitioner proffers this colloquy of the *voir dire* examination of Ms. Pferrman as a reason why the trial judge should have struck her for cause:

Pferrman: I'm not real happy being here.

Q: Why not?

Pferrman: I feel as though I have always tried to be a law abiding citizen, and when someone breaks a law, I have to go out of my way. It may be selfish, but it's part of the actual system. Everybody has to be part of it, and that's how I feel, that since someone has broken the law I have to go out of my way. That's the way I feel.

Q: Are you saying you're assuming someone already broke the law and that's why you're here?

Pferrman: Yeah. Or why would they even be here.

Q: Are you assuming that this man broke the law?

Pferrman: Well, he hasn't been convicted of it yet. He's innocent until proven guilty. But eventually (sic) he's done something.

Q: You're assuming that he did something?

Pferrman: Yes.

(*Voir dire* Tr., Vol. III at 591).

The court denied Petitioner's request to have Ms. Pferrman removed because she stated that she would accept the law and accept the presumption of innocence. However, Petitioner disputes the court's assessment of Ms. Pferrman, maintaining that the trial judge demonstrated his uneasiness with her serving on the jury when he addressed her again the following day about her acceptance of the law and acceptance of the presumption of innocence. Further, Petitioner asserts that the trial judge's true feeling regarding whether Ms. Pferrman should have been struck for cause is evidenced in his address to the court after the alternate jurors had been selected. The trial judge stated:

[Ms.] Pferrman, when she was here, she said she was upset about the judicial system, what was going on. Well it's unfortunate she didn't have an opportunity like you to go through it, and she would find out what's going on. She has a strong opinion.

(*Voir dire* Tr., Vol. IV at 658).

Petitioner asserts that, because it was clear during the *voir dire* proceedings that Ms. Pferrman was biased and should have been removed for cause, the court's failure to excuse her violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights to the Constitution.

Respondent argues that the denial of Petitioner's challenge for cause did not deprive him of an impartial jury, or a fair trial. Respondent argues that even though the record indicates that Ms. Pferrman held certain beliefs, she acknowledged that she could put those beliefs aside in this case. Respondent contends that the trial judge recognized that Ms. Pferrman could preside as a juror and adjudicate the case according to the law the court would provide. Therefore, Respondent maintains that Petitioner's rights under the Constitution were not violated.

■■■■ We agree that the record does not show that the trial court's decision denying Petitioner's challenge for cause was erroneous. The Sixth and Fourteenth Amendments to the Constitution guarantees a criminal defendant a right to a fair trial by a panel of impartial jurors. *Wainwright v. Witt*, 469 U.S. 412, 418, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also Tinsley v. Borg*, 895 F.2d 520, 523 (9th Cir.1990). The constitutional standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties in accordance with his instruction and oath.'" *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Based on the trial judge's impression of each of the prospective juror's answers, the judge must decide whether each prospective juror can be impartial. *McQueen*

*v. Scroggy,* 99 F.3d 1302, 1321 (6th Cir. 1996). That question is not one of law or fact, but of "historical fact." *Id.* at 1320 (citing *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)); *Tinsley,* 895 F.2d at 525.

■■■■ The Petitioner bears the burden of showing that a juror was unable to set aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court. *Hammer v. Bowlen,* 934 F.Supp. 911, 916 (M.D.Tenn.1996) (citing *Irvin,* 366 U.S. at 723–24, 81 S.Ct. 1639). Essentially, the trial judge's determination is one of credibility. *Tinsley,* 895 F.2d at 525. In particular, the trial judge observes the prospective juror's demeanor in light of the flow of the questions and answers. *Id.* In doing so, statements that may seem confusing and conflicting are made comprehensible. *Id.* In the end, the trial judge's determinations as to juror impartiality are presumed correct, and can be rebutted only by convincing evidence. *Patton,* 467 U.S. at 1038, 104 S.Ct. 2885. Moreover, the trial judge's decision concerning whether a potential juror could put any biases aside is entitled to great deference. *McQueen,* 99 F.3d at 1320; *see also Patton,* 467 U.S. at 1038, 104 S.Ct. 2885; *Tinsley,* 895 F.2d at 525; *accord Knaubert v. Goldsmith,* 791 F.2d 722, 727 (9th Cir. 1986). Furthermore, not only do the findings of the state trial court deserve "a high measure of deference" on the question of juror impartiality, but the state appellate court's findings do as well. *See Tinsley,* 895 F.2d at 525.

■■■ During the *voir dire* proceedings of the present case, the trial judge appropriately concluded, based on his impression of Ms. Pferrman's answers and also her demeanor, that she could impartially preside over Petitioner's state trial if she was required to do so. The trial judge specifically questioned Ms. Pferrman regarding her beliefs and whether, regardless of her beliefs, she could accept the law as provided by the court and accept the

presumption of innocence (*Voir dire* Tr., Vol. III at 592). Ms. Pferrman answered the question in the affirmative. When she was also questioned by defense counsel on her impartiality, Ms. Pferrman answered that she would be a good juror because she was unbiased, "right in the middle of the road ... [and] not partial to anything" (*Voir dire* Tr., Vol. III at 588). Petitioner has not carried his heavy burden in this case. Mindful that the state court's credibility findings and findings of a juror's ability to be impartial deserve "a high measure of deference," we conclude that the trial court did not abuse its discretion in denying Petitioner's request to strike Ms. Pferrman for cause.

■■■ Secondly, other than his bare assertion, Petitioner makes no showing that had he would have been better off by striking Mr. James Nickerson. As the Sixth Circuit stated, "it is not enough for a defendant to say 'I would have been better off if....' He must demonstrate that judicial or prosecutorial action (or inaction) resulted in a constitutional violation, not a tactical or strategic disadvantage." *McQueen,* 99 F.3d at 1320–21. The Constitution is not designed to afford either party a right to the most advantageous tactical or strategic situation possible. *Id.* Rather, the Constitution is designed to ensure that a person receives a fair trial by an impartial jury. *Id.*

Accordingly, we conclude that Petitioner was not deprived a constitutional right by the trial court's decision to deny his request to excuse Ms. Pferrman for cause. In sum, peremptory challenges are a means to achieve the end that is an impartial jury. So long as the jury that sits is impartial, and Petitioner has made no showing otherwise in this case, the fact that he had to use his peremptory challenges to achieve that result does not show a violation of his constitutional rights. Thus, Petitioner's first claim of relief is hereby DENIED.

**CLAIM 2:**

Petitioner's conviction for attempted rape and the death penalty specification of attempted raped are based upon insufficient evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In his second claim for relief, Petitioner argues that there was insufficient evidence used to convict him of aggravated murder during the course of an attempted rape of Ms. Acoff and the accompanying specification that the aggravated murder was committed during the course of an attempted rape of Ms. Acoff. Respondent counters that the evidence was constitutionally sufficient to sustain Petitioner's conviction.

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt every element necessary to constitute the crime charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *see also Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Harris v. Marshall,* 687 F.Supp. 1166, 1168 (S.D.Ohio 1987). When a state prisoner challenges his conviction on the ground that the jury's verdict is not supported by sufficient evidence, the standard of review is:

Whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. In other words, the court does not ask itself whether it believes the record evidence at trial established guilt beyond a reasonable doubt or whether the instructions given the jury were proper. Instead, the court examines the evidence in a light most favorable to the government, and every inference from the evidence presented must be drawn in favor of the government. *Jackson,* 443 U.S. at 319, 99 S.Ct.

2781; *Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Woodby v. I.N.S.,* 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Brown v. Davis,* 752 F.2d 1142, 1147 (6th Cir.1985).

We recognize that, at a minimum, "reasonable doubt" is one based upon "reason" created either from the evidence or a lack thereof. *Jackson,* 443 U.S. at 317 & n. 9, 99 S.Ct. 2781; *see also Johnson,* 406 U.S. at 360, 92 S.Ct. 1620. The evidence need not be absolute in convincing the trier of fact of the defendant's guilt beyond a reasonable doubt. *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir.1983) (stating that "the inquiry as to sufficiency of the evidence does not require or permit a court 'to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' "); *see also Coleman v. Edwards,* No. 96–3974, 1998 WL 791823, at *1 (6th Cir. Nov.4, 1998). Moreover, in federal habeas review, all possible interpretations of the evidence except guilt beyond a reasonable doubt need not be ruled out. *Harris,* 687 F.Supp. at 1168 (citing *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir. 1986); *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984) (indicating that circumstantial evidence may be sufficient to sustain a conviction, and that such evidence need not remove every reasonable hypothesis except that of guilt)).

When a federal court is presented with a record that supports conflicting inferences, it must presume that the trier of fact resolved any conflict in favor of the prosecution. *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781. It was the jury's duty to choose which of defendant's statements it believed, *Scott v. Perini,* 662 F.2d 428, 434 (6th Cir.1981), and not the district court's responsibility to weigh the credibility of witnesses. *Walker,* 703 F.2d at 970. Furthermore, the district court is not permitted to overturn a conviction merely because it would have acquitted the defendant had it acted as the finder of fact. *Brown,* 752 F.2d at 1147; *Walker,* 703

F.2d at 969. The Fourteenth Amendment imposes "no requirement that all other interpretations of the evidence except guilt of the defendant be ruled out." *Delk v. Atkinson*, 665 F.2d 90, 100 (6th Cir.1981).

Under Ohio law, in order to prove Petitioner attempted to rape Ms. Acoff before her death in March of 1985, the State had to prove that he purposefully or knowingly engaged in conduct that, if successful, would have constituted or resulted in Ms. Acoff being raped. *See* Ohio Rev.Code § 2923.02 (defining "attempt").[5] At the time of the offense, Ohio law defined "rape" as:

> (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply: (1) The offender purposely compels the other person to submit by force or threat of force.

Ohio Rev.Code § 2907.02. Furthermore, § 2907.01(A) defines vaginal penetration as "sexual conduct."

On August 5, 1985, a jury convicted Petitioner of attempted rape, which supported his aggravated burglary conviction. Both of these specifications then elevated the murder of Ms. Acoff to felony murder, a capital offense under Ohio law. In his appeal to the Ohio Supreme Court, Petitioner asserted a challenge as his third proposition of law that the evidence was insufficient to find him guilty of attempted rape. *Henderson*, 39 Ohio St.3d at 27, 528 N.E.2d 1237. The Court rejected Petitioner's challenge based on an examination of the evidence. The Ohio Supreme Court made detailed findings of fact supporting the criminal conviction, *Id.* at 24–25, 528 N.E.2d 1237, which are set out verbatim above at pages 4–7.

▆▆ In the instant matter, Petitioner maintains that the evidence at trial was insufficient to support his conviction, asserting that the fact that Ms. Acoff's body was found nude and lying face up is not enough to sustain a verdict of attempted rape. In compliance with the principles set forth in *In re Winship* and *Jackson*, this Court's analysis concerns only whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. After reviewing the evidence, we answer this question affirmatively. Moreover, we find that the evidence is overwhelming that Petitioner attempted to rape Ms. Acoff before her death on that early morning in March.

Ms. Acoff's body was found in her apartment on the living room floor. She was nude and lying in an upward position. Her legs were spread apart. The cause of death was ruled to be multiple stab, incised, and blunt injuries to the head, chest, neck, and upper extremities. The deputy coroner testified that, in light of the general pattern of the bloodstains over the upper torso of Ms. Acoff's body, she was killed while lying in a horizontal position. Additionally, even though a gold chain, television set and stereo were all within a close proximity of Ms. Acoff's, the State presented evidence at trial that nothing was stolen from the apartment.

Investigators also discovered semen in Ms. Acoff's vagina. While the discovery of the semen tends to corroborate the fact that Ms. Acoff engaged in sexual intercourse hours before her death with her boyfriend, James Martin, who is a type O secretor, the semen found in her vagina is also consistent with Petitioner's blood type. The semen is also consistent with the semen stains found on Petitioner's coat, which also bore bloodstains consistent with Ms. Acoff's blood type (AB). Petitioner attempts to discount the importance of the semen by pointing to the fact

---

5. Ohio Rev.Code § 2923.02 defines "attempt" as:

(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense.

that Ms. Acoff's genital area was not injured. However, we find this suggestion fails to counteract the inference that an attempted rape occurred. This is especially true in light of the fact that Ms. Acoff's left hand had been cut and wrapped in a towel. This fact may have led the jury to infer that there was some lapse in time between the first aggressive act toward Ms. Acoff and her eventual demise. Coupling the inference of a break in the time of Petitioner's first aggressive act toward Ms. Acoff with the coroner's conclusion that she was eventually murdered in a horizontal position as well as the fact that her body was found nude with her legs spread apart, we believe that there was sufficient evidence from which a jury could conclude that Petitioner attempted to make Ms. Acoff submit by force or the threat of force to sexual intercourse regardless of whose semen was on Petitioner's coat.

Thus, upon review of the record and facts therein, we conclude that there was sufficient evidence from which the court could find Petitioner guilty of attempted rape and therefore guilty of aggravated burglary, which raised the charge against him to felony murder, and thus, to a capital case. We hereby DENY Petitioner's second claim for relief.

*CLAIM 3:*

**The aggravating circumstances charged as specifications to felony-murder counts in the indictment failed to narrow the class of death-eligible individuals. The aggravating circumstances allege conduct which is identical to the conduct charged in felony-murder felony, and fail to narrow the class at all. The failure to narrow the class of persons eligible for the death penalty denied Petitioner Henderson his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his third claim for relief, Petitioner argues that Ohio's capital sentencing scheme fails to narrow the class of individuals who become death-eligible. Petitioner asserts that a reading of Ohio Rev.Code §§ 2903.01(B) [6] and 2929.04(A)(7) [7] in light of one another shows that every aggravated felony murder in Ohio is automatically death-eligible. Petitioner contends that the statutory scheme enables the prosecution to bootstrap a murder committed during the course of a felony to the enumerated felonies in order to increase the charge from murder to aggravated murder to then make an individual death-eligible.

Respondent challenges Petitioner's claim, asserting that, in order for a defendant to be sentenced to the death penalty in Ohio, they must first be found guilty of aggravated murder pursuant to Ohio Rev. Code § 2903.01 and then satisfy one or more of the eight statutory aggravating circumstances under Ohio Rev.Code § 2929.04. Although Petitioner contends that the unconstitutionality of the Ohio law exists in the fact the seventh statutory aggravating circumstance in § 2929.04(A)(7) overlaps with the underlying offense of the felony murder category, Respondent cites to *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), for the proposition that Ohio's statute did suf-

**6.** Section 2903.01(B) provides:

No person shall purposefully cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

**7.** Section 2929.04(A)(7) provides, in pertinent part:

The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation or design.

ficiently narrow the class of death-eligible offenders.

The Ohio Supreme Court also reviewed this claim on appeal as Petitioner's fourth proposition of law. Citing *Jenkins*, the Ohio Supreme Court rejected Petitioner's contention. Moreover, the Ohio Supreme Court stated:

> R.C. 2929.04(A)(7), which sets forth the aggravating circumstances of aggravated burglary and rape, fulfills that purpose by allowing the death penalty to be imposed for felony murder only when the defendant was the principal offender or when the murder was premeditated. By such a limitation, the Ohio General Assembly has complied with *Zant [v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ], by narrowing the class of death-eligible aggravated murders.

> Even if we assume, for the sake of argument that the aggravating circumstances for felony murder (set forth in R.C. 2929.04[A][7] ) are identical to the elements of aggravated murder (set forth in 2903.01[B] ), the Ohio death penalty scheme is constitutional.

*Henderson*, 39 Ohio St.3d at 28–29, 528 N.E.2d 1237.

In *Jenkins*, the appellant argued that the aggravating factors for felony murders duplicated the elements of the offense. According to the appellant, this was in stark contradistinction to the offense of murder by calculation and design because it required proof of a separate aggravating circumstance in order to justify the sentence of death. *See id.* at 177, 473 N.E.2d 264. The court in *Jenkins* concluded that, even assuming the aggravated conduct of felony murder set forth in R.C. § 2903.01(B) was functionally equivalent to the aggravating circumstance under R.C. § 2929.04(A)(7), no constitutional infirmities would arise. *Id.* at 178, 473 N.E.2d 264. The *Jenkins* court declared that:

> On the contrary, any duplication is the result of the General Assembly having set forth in detail when a murder in the

course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option.

*Id.*

In 1988, the United States Supreme Court reaffirmed in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the proposition that a state's capital sentencing scheme must genuinely narrow the class of individuals eligible for the death penalty as compared to those found guilty of an underlying offense. *Id.* at 244, 108 S.Ct. 546. Immediately following the *Lowenfield* decision, the Ohio Supreme Court revisited the issue of whether a capital specification based upon § 2929.04(A)(7) narrows the class of those charged with felony murder in *State v. Benner*, 40 Ohio St.3d 301, 533 N.E.2d 701 (1988). In *Benner*, the Ohio Supreme Court reaffirmed its holding in *Jenkins* that "the aggravating circumstances of § 2929.04(A)(7) and the elements of aggravated murder under § 2903.01(B) are not duplicative, and, therefore, not constitutionally infirm." *Id.* at 306–307, 533 N.E.2d 701.

■ Accordingly, we conclude that no constitutional infirmity arises when the State of Ohio charges an individual with aggravated murder pursuant to § 2903.01(B) of the Ohio Revised Code and accompanied by a capital specification based on § 2929.04(A)(7). Thus, Petitioner's third claim for relief is DENIED.

## CLAIM 4:

**The jury at Petitioner's trial was repeatedly told that the responsibility for determining the appropriateness of the death sentence lay elsewhere, a statement which is incorrect under Ohio law as a matter of law and fact. This violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his fourth claim for relief, Petitioner argues that during the course of the *voir dire,* trial, and penalty phase of the proceedings, the court repeatedly informed the jury that its verdict was only a recommendation and that the court would be the final decisionmaker in the case. Petitioner asserts that the remarks of the court diminished the jury's sense of responsibility and, in effect, encouraged the jury to render a verdict of death. Petitioner argues that the overall result of the jury's diminished sense of responsibility is an arbitrary and capricious sentencing decision in violation of the Constitution.

Respondent disagrees with Petitioner's assertions, arguing that even though the instruction presented by the presiding judge was not an instruction preferred by the Ohio Supreme Court, it has been held to represent an accurate and non-prejudicial statement of Ohio law.

The Supreme Court of Ohio found Petitioner's argument to be without merit, reasoning that the court's presentation of an instruction that accurately states Ohio law was sufficient to preclude reversible error. *Henderson,* 39 Ohio St.3d at 30, 528 N.E.2d 1237.

In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court recognized that there is an inherent danger in causing jurors in a capital case to believe that the ultimate responsibility for the death sentence lies elsewhere instead of with them. *Id.* at 328–29, 105 S.Ct. 2633 (declaring that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who had been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). The Supreme Court declared that the prosecutor in *Caldwell* sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 340, 105 S.Ct. 2633 (citation omitted).

■ In a later case, the Supreme Court indicated that a claim under *Caldwell* is relevant only to certain types of comments, namely those that lull the jury into feeling less responsible than it should for its sentencing decision. *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). In other words, in order to establish a violation of *Caldwell,* the defendant must show that either the prosecutor or the trial judge improperly described the jury's role under the state law in order to "water down" the jury's responsibility. *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1101 (6th Cir.1990). However, if the jury instructions that are challenged by the defendant accurately describe the role of the jury under the state law, there is no basis for a *Caldwell* claim. *Dugger,* 489 U.S. at 407, 109 S.Ct. 1211. Therefore, the defendant must show that the remarks to the jury that the defendant challenges improperly described the role assigned to the jury by the local law. *Id.*

As set forth in this case, the law of Ohio states:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life impris-

onment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section, [which requires that the court weigh any aggravating and mitigating factors, and impose the death penalty if the former outweigh the latter, and impose a life sentence otherwise.]

Ohio Rev.Code Ann. § 2929.03(D)(2). In the present matter, Petitioner points to the following instruction given by the trial judge as being violative of his constitutional rights:

I've told you when you first came in this morning, the lawyers have mentioned it to you, that a jury recommendation to the Court that the death penalty be imposed is just that. It's a recommendation. It is not binding on me.

The final decision under the law in the event you recommend the death penalty is up to me. I may, under the guidelines that I have to follow, either accept or reject your recommendation. However, I want to impress upon you that because the ultimate decision may end up with me, don't take your job too lightly.

(Tr. Vol. VII, at 672).[8]

■■■ While, at first glance, Petitioner's assertion that the trial judge's charge to the jury that a verdict of death would be a non-binding "recommendation" to the court seems to diminish the responsibility of the jury, we note that the trial judge's instructions to the jury accurately followed the law of Ohio. More specifically, even though it would be inaccurate for a judge to state that a sentencing jury "recommends" a life sentence when such a recommendation would be binding on the court, the law of the state of Ohio clearly indicates that a sentence of death may be imposed after a recommendation to the court by the jury and after the court has independently weighed the aggravating and mitigating factors. *See* Ohio Rev. Code § 2929.03(D)(2).

---

8. Other excerpts from the trial judge's charging comments include:

Court: In this second trial or hearing, your job will be to recommend which penalty the defendant is to suffer for his crime. So, then, it's my obligation to give you the law which you will use to guide yourself.

And, again, as I did during the first trial, I want to remind you that you have to accept the law as I give it to you and not change it to suit yourselves.

Also as I explained to you during the course of this hearing, the opening statements and the final arguments of the lawyers are not evidence at all. So, again, you have to decide from the evidence what penalty to recommend.

(Tr. Vol. VII, at 666).

Court: Mr. Henderson has been found guilty by you of aggravated murder with aggravating circumstances. The State of Ohio is asking that you recommend the death penalty. Before you can do this, the State has the obligation to prove beyond a reasonable doubt that the aggravating circumstances you have already found to exist in this case outweigh any mitigating factor you may find to exist.

(Tr. Vol. VII, at 669).

Court: Before you recommend the death penalty, you must find beyond a reasonable doubt certain things. What are they? First of all, that the aggravating circumstances outweigh any mitigating factors in this case.

(Tr. Vol. VII, at 670).

Court: In the event that you do not recommend the death penalty, obviously you would continue your deliberations and you'll recommend one of two other possible penalties.

(Tr. Vol. VII, at 673).

Petitioner also refers to other occasions when the court informed the jury that its verdict was only a recommendation. However, we can discern no error in the charge to the jury about their role in recommending sentence. Moreover, none of the comments made by the trial judge misstated the jury's role pursuant to Ohio Rev.Code § 2929.03 nor were they outside the boundaries set forth by *Caldwell.* The comments only stated that the jury would recommend to the trial court the sentence to be imposed; they did not diminish the sentencing responsibility of the jury.

Noting that a similar instruction has been upheld by the Supreme Court of Ohio in both *State v. Steffen,* 31 Ohio St.3d 111, 113–14, 509 N.E.2d 383, 387–88 (1987), and *State v. Buell,* 22 Ohio St.3d 124, 143–44, 489 N.E.2d 795, 811–13 (1986), and finding nothing in the comments to show that the jury's responsibility for determining the appropriateness of the death sentence was diminished, we conclude that there was no violation of Petitioner's constitutional rights. In short, the jury's role was not diminished to the point that an arbitrary and capricious sentencing decision was made. Thus, we hereby DENY Petitioner's fourth claim for relief.

### CLAIM 5:

**Petitioner was denied due process and equal protection of the law when his trial attorney's request for a two-week continuance within which to prepare for mitigation was denied in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his fifth claim for relief, Petitioner argues that immediately after he was found guilty of aggravated murder with specifications, his counsel requested a minimum of two to three weeks to prepare for the sentencing hearing. Additionally, Petitioner's counsel requested that there be a presentence investigation and a psychiatric exam performed on Petitioner. Petitioner's counsel informed the court that he needed a minimum of two to three weeks because he did not know of the availability of a number of people who could assist him with the investigation. Counsel also expressed his belief that a psychiatric exam could take anywhere from four to six weeks to conduct. Nevertheless, the court instead provided the Petitioner with one week, expediting the presentence investigation and psychiatric examination. The sentencing phase of the proceedings was scheduled one week from the date of the jury's finding of guilt.

Petitioner also contends that, even though on the day prior to the start of the sentencing phase of the trial a question of his competency was raised with the court, the trial judge expedited an examination on that same day and held a hearing on the matter. Petitioner points to the findings of Dr. Schmidtgoessling, the psychologist who examined him, to strengthen his contention that there was a serious question concerning his competency before the court. However, Petitioner's renewed request for a continuance of the proceedings was denied by the court. Petitioner argues that the trial court's denial of his request for more time to prepare for the sentencing phase of the proceedings was an abuse of discretion, especially in light of the fact that the trial court denied his counsel's earlier request to appoint co-counsel or a psychologist or psychiatrist to assist him at trial.

Respondent argues, on the other hand, that there was no abuse of discretion by the trial court. Moreover, assuming that the trial court did err in not granting Petitioner's request for a continuance, Respondent asserts that such any error on the part of the trial court did not rise to such a level that Petitioner was deprived of fundamental fairness.

In overruling Petitioner's ninth assignment of error, namely that he was denied a two to three-week continuance between the guilt phase and the sentencing phase of the bifurcated proceedings, the Hamilton County Court of Appeals noted that

Petitioner was well aware of the possibility of being found guilty, yet he allowed time to pass without preparing to deal with that possibility. Specifically, the appellate court stated:

> In the instant case, approximately three months expired between the indictment and the jury's verdict concerning guilt. For that period of time the appellant knew that there was the possibility that he might have to face a sentencing hearing in the capital proceedings.

(Appendix to Return of Writ, Vol. I, Ex. F at 20).

The Ohio Supreme Court heard arguments surrounding this contention by Petitioner and also intimated that Petitioner should have anticipated the need for a psychological exam well before the verdict. *Henderson,* 39 Ohio St.3d at 30, 528 N.E.2d 1237. The court stated that "[a]lmost three months had passed between the time of the indictment and the jury's verdict concerning guilt, during which counsel was well aware that appellant might face capital sentencing procedures." *Id.* Acknowledging that the decision of whether a continuance would be granted was within the discretion of the trial court, the Supreme Court of Ohio concluded that Petitioner failed to show that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Id.*

 Generally, the discretion of whether a continuance will be issued is left within the sound discretion of the trial court judge. *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (concluding that broad discretion must be granted to trial courts on matters of continuances); *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Thus, when examining a trial judge's denial of a motion to continue, the judge's decision will be reversed only for an abuse of discretion. *Wilson v. Mintzes,* 761 F.2d 275, 281 (6th Cir.1985); *United States v. Wirsing,* 719 F.2d 859, 865 (6th Cir.1983); *United States v. Faulkner,* 538 F.2d 724, 729 (6th Cir.1976); *United States*

*v. Ploeger,* 428 F.2d 1204 (6th Cir.1970). There is no mechanical test for deciding when a denial of a continuance is so arbitrary as to violate due process. *Ungar,* 376 U.S. at 589, 84 S.Ct. 841. The court is required to look at the circumstances present in every case, paying particular attention to the reasons presented to the trial judge at the time the request for a continuance was made. *Id.* (citation omitted).

 In cases where claims exist to the effect that the trial court's denial of a request of a continuance to allow further preparation resulted in counsel's ineffectiveness, a court will not presume that the Petitioner was prejudiced. *United States v. Cronic,* 466 U.S. 648, 661–62, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). To the contrary, the court will only presume that prejudice occurred from the trial court's refusal to grant a continuance in limited and egregious circumstances. *Chadwick v. Green,* 740 F.2d 897, 900 (11th Cir.1984). The Sixth Circuit has indicated that, in determining whether prejudice occurred, the court should explore whether the continuance "would have made relevant witnesses available, or added something to the defense." *Faulkner,* 538 F.2d at 730 (internal citations omitted).

In the instant case, Petitioner's counsel did not proffer to the trial court avenues of investigation he was professionally obligated to pursue to provide his client with the effective assistance of counsel, but was unable to pursue because of inadequate time to prepare for the penalty phase. Petitioner's counsel, Clayton Shea, merely made a bare request after his client was found guilty for a minimum of two or three week period to prepare for the sentencing phase. Attorney Shea indicated to the court that he had some people helping him on the case, that their schedules were unknown, and that he would need two or three weeks to conduct a pre-sentence investigation to prepare for the mitigation phase because, according to him, that was "customary for most felony sentencing

hearings to be four, maybe five weeks after the guilty phase." (*See* Tr. Vol. 6, at 563–64).

■ On these facts, we cannot say that the decision of the trial judge to deny Petitioner's request for a continuance was an abuse of discretion, and, thus was a denial of due process. Petitioner's assertion that a capital case is a most exhausting task for counsel and that his counsel should have been given time to recharge himself after the jury found Petitioner guilty is unpersuasive. Moreover, Petitioner has not shown that, had his attorney had more time to prepare for the mitigation phase of the trial, the outcome would likely have been different. Thus, we find that the trial judge's decision to deny the request for the continuance was not arbitrary and unreasonable in light of the circumstances. Petitioner's fifth claim for relief is hereby DENIED.

### CLAIM 6:

**The trial court mitigation instruction which limited the jury's consideration to two (2) of the statutory mitigating factors violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his sixth claim for relief, Petitioner argues that the trial judge's decision to advise the jury that they must only consider two mitigating factors—Petitioner's history and background—precluded the jury from considering other relevant mitigating factors such as his youth (age 26) and any mental disease or defect that he may have been suffering from at the time of the crime. Thus, Petitioner asserts that this undermined his rights under the Constitution at the sentencing phase.

Respondent challenges this contention on the basis that the trial judge allowed the jury to consider Petitioner's history, background, and any other facts or factors relevant to the issue of whether he should be sentenced to death. Respondent contends that Petitioner's counsel agreed that these were the only relevant factors pre-sented during the penalty phase. Therefore, Respondent asserts that the court did not restrict the jury's consideration of any appropriate factors during sentencing.

Petitioner asserted this contention on direct appeal in his eleventh assignment of error. However, the court of appeals overruled his claim. The court of appeals concluded that "even if it was error to instruct the jury on the remaining mitigating factors, ... such error is harmless beyond a reasonable doubt in light of this court and the Ohio Supreme Court to make the independent review of the death sentence pursuant to R.C. § 2929.05." (Appendix to R.O.W., Vol. I, Ex. F at 25).

Subsequently, the Ohio Supreme Court reviewed the claim as Petitioner's seventh proposition and concluded that:

> The two factors considered by the jury (i.e., R.C. § 2929.04[B] and 2929.04[B][7] ), were the only ones that appellant wanted the jury to consider, as reflected by defense counsel's argument to the court, out of the presence of the jury. The trial court must give the defendant great latitude in the presentation of mitigating factors. R.C. § 2929.04(C). However, appellant cannot fail to present evidence of other mitigating factors, assert that the jury may not consider factors not presented and then, on appeal, argue that he has been prejudiced by such a course of events.

*Henderson,* 39 Ohio St.3d at 30, 528 N.E.2d 1237.

■ We agree with the Ohio Supreme Court that Petitioner is attempting to manipulate the process, and thus, we reject his claim. Indeed, the penalty of death is qualitatively different from any other sentence. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). The difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. *Id.* A sentencing instruction that precludes the sentenc-

er from "considering as a mitigating factor, any aspect of a defendant's character's or record ... that the defendant proffers as a basis for a sentence less than death" would certainly be invalid. *Id.* Logically, an instruction that leaves a jury confused as to whether it may consider any aspect of the defendant's character or record would also be invalid. However, the burden of going forward with the evidence of any factors in mitigation to the imposition of the death penalty is on the defendant. *See* Ohio Rev.Code § 2929.03(D)(1).[9] Where defendant does not present evidence of those factors, he cannot then not make a one-hundred-eighty degree turn and argue that he was prejudiced by not being able to present evidence on mitigation. In this case, we find no merit in Petitioner's assertion that the jury was precluded from considering other aspects of his character and record. We find Petitioner's sixth claim for relief without merit.

### CLAIM 7:

**The trial court's denial of funds with which to employ an expert psychologist or psychiatrist to aid in trial and mitigation preparation and presentation denied Petitioner Henderson a fair trial, due process, equal protection and violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his seventh claim for relief, Petitioner argues that the trial judge's denial of his request to appoint a psychiatrist or psychologist to assist him at the expense of the State during his trial and also during the sentencing phase of the proceedings violated his constitutional rights. Petitioner maintains that he suffers from a major psychiatric disorder that constitutes a mental disease or defect within the meaning of Ohio Rev.Code § 2929.04(B)(3) to

which he could have shown that he did not possess the requisite culpable state of mind to commit the offense of aggravated murder. Because he was precluded from proffering such evidence to establish this defense to the jury due to the court's denial of state-provided psychiatrist or psychologist, Petitioner asserts that he was denied effective assistance of counsel at his trial.

Respondent acknowledges that Petitioner was denied the assistance of a psychologist and psychiatrist at state expense. However, Respondent asserts that Petitioner failed to satisfy the requisite showing necessary to establish a constitutional right to such assistance. Respondent contends that Petitioner did not demonstrate any specific need for psychiatric assistance at trial or during the mitigation phase.

Petitioner raised this claim on direct appeal as his seventh assignment of error. However, the court of appeals found the claim without merit (Appendix to R.O.W., Vol. I, Ex. F at 15). The court of appeals reached its conclusion after examining the record and determining that nowhere within the record did Petitioner demonstrate that his sanity at the time of the offense was to be a significant factor at trial (*Id.* at 16).

The Ohio Supreme Court heard Petitioner's argument related to the trial court's denial of his pretrial motion to hire a psychiatrist and psychologist at the state's expense and affirmed the decision of the court of appeals. The Ohio Supreme Court noted that "[p]rior to [Petitioner's] conviction, [he] filed neither an insanity plea nor made a suggestion of incompetency." *Henderson,* 39 Ohio St.3d at 31, 528 N.E.2d 1237. Thus, the Supreme Court of Ohio declared that Petitioner's reliance on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct.

---

9. Ohio Rev.Code § 2929.03(D)(1) states:
 The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof be-

 yond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

1087, 84 L.Ed.2d 53 (1985), for the proposition that he could have established the mitigating factor of a diminished capacity set forth in R.C. § 2929.04(B)(3) with the services of a psychiatrist at the onset of trial is misplaced because "he did not demonstrate to the court that his sanity at the time of the offense was to be a significant factor at trial." *Id.* The Court further opined that:

> Defense counsel's bare assertion that psychiatric services are necessary for adequate case preparation, standing alone does not meet the test for *Ake, supra,* or *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264 (1984).

*Henderson,* 39 Ohio St.3d at 31, 528 N.E.2d 1237.

In *Ake,* the Supreme Court addressed the issue of when a state may be required to provide an indigent defendant access to a psychiatric examination and assistance necessary to prepare an effective defense. The Court held that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. *Id.* at 83, 105 S.Ct. 1087.

In *Ake,* Glen Burton Ake was arrested for allegedly murdering a couple and assaulting their two children. *Ake,* 470 U.S. at 70, 105 S.Ct. 1087. During his pretrial proceedings, the trial judge found Ake's behavior to be so bizarre that the trial judge *sua sponte* ordered a psychological examination be performed on him. *Id.* at 71. The examining psychiatrist found that there were times during his examination that Ake appeared to be delusional. He diagnosed Ake as a probable paranoid schizophrenic and recommended a prolonged psychiatric evaluation to determine Ake's competence to stand trial. Consequently, Ake was committed to a state hospital. Ake was later found not to be competent to stand trial by the chief forensic psychiatrist and committed to a state mental hospital. *Id.* Six weeks later, the chief forensic psychiatrist informed the court that Ake had become competent to stand trial. Thereafter, a his trial proceeded for the alleged murders and assaults. *Id.* at 72, 105 S.Ct. 1087.

At a pretrial conference, Ake's counsel informed the court that his client would raise an insanity defense and that he needed a psychiatric examination conducted of Ake to adequately prepare. The purpose of the examination would be to determine Ake's mental condition at the time of the alleged crimes. Because Ake was indigent, his counsel requested that the court arrange the examination or to provide funds to allow the defense to arrange one. The court, however, rejected the request.

At Ake's trial, the jury did not hear any evidence regarding his mental state at the time the crimes were committed. The jury was instructed on the issue of insanity and informed that they could presume that he was sane at the time of the crime unless he presented evidence sufficient to raise a reasonable doubt about his sanity at that time. Having heard no evidence on the issue of his sanity at the time of the crime, the jury rejected Ake's insanity defense and returned a verdict of guilty on all counts. Likewise, during the sentencing proceedings, there was no evidence placed into the record concerning Ake's mental state at the time the crimes were committed. The State then successfully moved for a death sentence on both of the murders.

The Supreme Court reversed the decision of the trial court and remanded the case for a new trial. The Court opined that once a defendant shows that his sanity at the time of the offense will be a significant issue at the trial, it is imperative that the trial judge provide that defendant access to a competent psychiatrist. *Id.* at 83, 105 S.Ct. 1087. According to the Supreme Court, "[w]ithout a psychiatrist's

assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor." *Id.* at 84, 105 S.Ct. 1087.

The Court further reasoned that the indigent defendant does not have a constitutional right to receive a psychiatrist of his or her own choosing or to one of his or her personal liking. *Id.* Instead, the trial court must only seek to ensure that the indigent defendant has *access* to a competent psychiatrist. The Court did not set forth any clear rule as to how the trial court must go about providing access. In fact, the Court left open the question of how to implement the indigent defendant's constitutional right to the discretion of the trial court. *Id.* The Court also expressed that its opinion applied to the sentencing proceedings of an indigent defendant's trial. *Id.* at 83–84, 105 S.Ct. 1087.

In *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir.1990), the Sixth Circuit agreed with other circuits that *Ake* establishes that, as a matter of due process, a guarantee of a state-funded psychiatric expert arises only when the defendant demonstrates that his sanity is a significant factor in the trial. *Kordenbrock*, 919 F.2d at 1119 (citing *Harris v. Vasquez*, 913 F.2d 606 (9th Cir.1990); *Cartwright v. Maynard*, 802 F.2d 1203 (10th Cir.1986); *Volson v. Blackburn*, 794 F.2d 173 (5th Cir. 1986); *Bowden v. Kemp*, 767 F.2d 761 (11th Cir.1985)). The Sixth Circuit then pointed out that Defendant Kordenbrock never raised the issue of his insanity as a defense in his case. Rather, he raised the issue in regards to whether drugs and alcohol had diminished his capacities, depriving him of the specific intent necessary to convict him of intentional murder. *Id.* Consequently, concluding that Kordenbrock failed to make allegations supported by a factual showing that his sanity was an issue in the case, the court declared that Kordenbrock's constitutional rights were not violated.

In the instant matter, the record reveals that Petitioner filed a pretrial motion on April 29, 1985 requesting the court appoint both a psychologist and psychiatrist. At no time prior to this time had Petitioner filed a plea of not guilty or guilty by reason of insanity. Furthermore, his counsel did not mention nor file a briefing indicating that Petitioner's competency was a significant factor in the case. The primary suggestion that Petitioner makes in his pretrial motion is that a psychiatrist and psychologist be appointed and the findings of each not be disclosed to the State. Petitioner provided no specific basis in his pretrial motion for the appointment of the psychiatrist and psychologist other than that it would "help in preparing a defense." Thus, contrary to Petitioner's assertions that, because aggravated murder under Ohio law requires the assailant to act "purposefully," he has the right to a psychiatrist and psychologist, we find that the right only exists when a defendant's sanity is shown to be a significant issue at trial. Moreover, Petitioner's contention that he had a right under Ohio Rev.Code § 2929.024 is misplaced in light of the reasoning of *Ake*. Petitioner simply made a bare contention in his pretrial motion that a psychiatrist and psychologist should be provided for him because "in this day and age of heightened criminal trials and lengthy mitigation hearings, … defendants employ psychologists and psychiatrists."

Petitioner also maintains that the denial of state-funded assistance of a psychiatrist or psychologist heightened the problems that his counsel faced without co-counsel. We find this argument unpersuasive in light of the fact that his sanity was not at issue in the proceedings. Accordingly, we hereby DENY Petitioner's seventh claim for relief to his Petition for a Writ of Habeas Corpus.

***CLAIM 9:***

**The supplemental charge to the deadlocked jury during the sentencing**

phase of the proceedings to continue their deliberations violated the Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

In his ninth claim for relief, Petitioner asserts that when the jury informed the trial judge that it was deadlocked in its sentencing deliberations, the trial judge's charge to the jury to continue deliberating was erroneous in light of Ohio Rev.Code § 2929.03(D)(2). Thus, Petitioner maintains that the use of the *Allen* charge (also referred to as a "dynamite" charge) [10] by the court violated his constitutional rights by creating an unreasonable and unacceptable risk of an arbitrary and capricious sentence.

Respondent counters that the trial judge's supplemental charge to the jury did not deprive Petitioner of a fair trial. Respondent asserts that the facts and circumstances show that the supplemental charge was not coercive nor was it prejudicial to have deprived Petitioner of his constitutional rights.

▆▆▆▆ We recognize that it is within the discretion of the trial court to encourage a jury to continue its deliberations and attempt to reach a verdict after the jury informs the court that it is deadlocked. *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896). However, any variation upon the precise language approved in *Allen* imperils the validity of the trial. *United States v.*

*Scott*, 547 F.2d 334, 337 (6th Cir.1977). Moreover, an instruction that strays too far from the charge approved in *Allen*[11] will rise to the level of a constitutional violation only if "in its context and under all the circumstances, [the charge] ... was coercive." *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir.1984) (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)). In reviewing a claim that the jury was coerced, the court must "consider the supplemental charge given by the trial court 'in its context and under all circumstances.'" *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (quoting *Jenkins*, 380 U.S. at 446, 85 S.Ct. 1059); *Jones v. Norvell*, 472 F.2d 1185, 1186 (6th Cir.1973). Furthermore, even where an *Allen* charge is found to be coercive by the court, the reviewing court must also make an examination of whether in fact the charge resulted in prejudice to the defendant. *United States v. Giacalone*, 588 F.2d 1158, 1168 (6th Cir.1978).

The Supreme Court of the United States recently addressed the issue of whether a defendant is entitled to an instruction as to the consequences of a jury deadlock in *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). In *Jones*, which involves the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.*, the Court concluded that the Eighth Amendment does not require that the jury be instructed as to the consequences of their failure to agree. *Id.* 119 S.Ct. at 2098. However, the Court acknowledged

---

10. *See* footnote 4, *infra.*

11. The charge provided in *Allen* is summarized as follows:

> ... that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a dispo-

> sition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

> *Allen*, 164 U.S. at 501, 17 S.Ct. 154.

that the Eighth Amendment does require that a sentence of death not be imposed arbitrarily. *Id.* (citing *Buchanan v. Angelone,* 522 U.S. 269, 275, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998)). Thus, the jury cannot be "affirmatively misled regarding its role in the sentencing process." *Id.* (citing *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994)). The Court went on to recognize its approval of the use of a supplemental *Allen* charge in the event that the jury becomes deadlocked. *Id.* 119 S.Ct. at 2099 n. 5. Furthermore, the Court noted that the uniformity of the courts of appeals in addressing the question. *Id.* 119 S.Ct. at 2099 n. 6. In particular, the Court cites to the Sixth Circuit decision of *Coe v. Bell,* 161 F.3d 320 (6th Cir.1998) as being one decision in the group that rejects the argument that the Constitution requires the trial judge provide the jury with an instruction as to the consequences of the jury's inability to agree. *Jones,* 119 S.Ct. at 2099 n. 6.

In *Coe,* the Sixth Circuit also addressed the issue of whether the jury should be informed of the consequences of the failure to achieve unanimity, and answered the question in the negative. *Coe,* 161 F.3d at 339–40. The *Coe* Court found it simply unreasonable that a minority juror would interpret the unanimity requirement of Tennessee's death penalty statute as directing the individual to give in to the majority. Thus, while the court in *Coe* concluded that the trial judge's adherence to Tenn.Code Ann. § 39–2404 (1982), and not informing the jury that he was mandated to give a life sentence if unanimity could not be reached, constituted giving the jury "incomplete information," the court found that it was not "misleading information." *Id.* at 340. The *Coe* Court concluded that, "[t]he state law did not unconstitutionally deceive the jury and infect the verdict in this case with unreliability, . . ." *Id.*

In another recent case, which we believe provides guidance for our reasoning in the present matter, the Sixth Circuit Court of Appeals found that the trial court's misapplication of Ohio Rev.Code § 2929.03(D)(2) during an instruction to the jury resulted in coercion and necessitated that the court vacate the inmate's sentence of death and remand the case for re-sentencing. *Mapes v. Coyle,* 171 F.3d 408, 416 (6th Cir.1999). In *Mapes,* the defendant was convicted of aggravated murder for the killing of a bar owner during a robbery on January 30, 1983. At the penalty phase of the trial proceedings, the judge then instructed the jury that it must reach unanimity on whether to recommend the death penalty before it could consider a recommendation of a term of imprisonment. *Id.* at 411. The trial judge specifically charged the jury as follows:

> Now, as I have indicated, if all twelve jurors find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, that is the aggravating circumstances which he was found guilty, Specification 4 in each count, then you must return a finding to the Court. I instruct you, as a matter of law, that if you make such a finding then you have no choice and must recommend to the Court that the sentence of death be imposed on the defendant, David Mapes.

> . . . . .

> On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, the other evidence, the unsworn statement of David Mapes, the evidence of the State of Ohio, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, David Mapes, was found guilty of committing outweigh the mitigating factors, then you will return your verdict reflecting your decision. That is, you must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors. In this event you

will then proceed to determine which of the two possible imprisonment sentences to recommend to the Court.

*Mapes*, 171 F.3d 408, 416. Noting that Ohio Rev.Code § 2929.03(D)(2) contained no requirement that a capital jury must unanimously reject a death sentence before considering life imprisonment, the Sixth Circuit panel rejected the trial court's application of the statute and declared that his case should be remanded for re-sentencing. *Id.* at 416 (recognizing that "the Ohio death-sentence statute contains no requirement that a capital jury must unanimously reject a death sentence before considering life imprisonment.... Thus, under the statute, a jury that was not unanimous either way on the death sentence could consider a life sentence").

Both *Coe* and *Mapes* serve as guidance to this Court for the simple fact that they examine the trial courts' instructions to the jury in light of the relevant state law. The *Coe* Court recognized that the trial judge was not required to instruct the jury of the consequences of it being unable to reach unanimity because Tennessee Code Ann. § 39-2404 (1982) did not mandate such provision. The *Mapes* Court recognized that the trial judge should not have required that a capital jury unanimously reject a death sentence before considering life imprisonment because that was not required pursuant to Ohio Rev.Code § 2929.03(D)(2). In short, so long as the law of the state is presented to the jury in a manner that is not misleading, *Jones, Coe,* and *Mapes* teach us that the use of the *Allen* charge by the trial court will be upheld.

■ Albeit not on all fours with any of the cases cited in regards to the facts, we believe that the instant matter stands parallel with *Mapes* in principle, in that because the trial judge's original charge to the jury in the penalty phase was not an accurate reflection of the language of § 2929.03(D)(2), the supplemental instruction to the jury resulted in coercion and prejudice to Petitioner in a manner that necessitates that his sentence be vacated and this matter remanded for re-sentencing.

■ Ohio Rev.Code § 2929.03(D)(2) specifically states that:

Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. *If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.* **Absent such a finding,** *the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.*

If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section, [which requires that the court weigh any aggravating and mitigating factors, and impose the death penalty if the former outweigh the latter, and impose a life sentence otherwise.]

Ohio Rev.Code Ann. § 2929.03(D)(2) (emphasis added). In this case, the trial judge's charge reads, in pertinent part:

> If the State of Ohio has proved beyond a reasonable doubt that either one of the aggravating circumstances of the murder outweighs any mitigating factor that may exist in this case, then it would be your duty to recommend the death penalty.
>
> However, if you find from the evidence that the State has failed to prove beyond a reasonable doubt that either one of the aggravating circumstances of the murder outweighs any mitigating factor that may exist, then it's your duty to not recommend the death penalty.
>
> * * * * * *

(Trial Tr. Vol. VII, at 673). The trial judge then went on to inform the jury that, "[i]n the event that you do not recommend the death penalty, obviously you would continue your deliberations and you'll recommend one of two other possible penalties" (*Id.*). This language does not accurately reflect the language in § 2929.03(D)(2). Moreover, we believe that the instructions the trial judge provided the jury only confused the jury as to the manner that they should deliberate and recommend a penalty in this case.[12] Certainly, the confusion is shown in the jury's deliberations, and the supplemental charge by the trial court muddied the water to the point that we are not confident in the outcome of the sentence.

The record shows that the jury began deliberating at 12:31 p.m. and continued until 9:15 p.m. on July 24, 1985. The jury was given breaks for meals during that time. The next morning, the jury commenced their deliberations at an unspeci-

fied time. At 1:22 p.m., the jury communicated to the trial court that they were "deadlocked period" (Tr. Vol. VII, at 683). The court then gave the following supplemental charge to the jury:

> Well, let me just say this to all of you, I want to remind each of you that you all took an oath, and that oath was to well and truly try in true deliverance make between the State of Ohio and the defendant, Jerome Henderson. This means that your verdict, your recommendation in this penalty hearing, must be based on the evidence that you received in this courtroom.
>
> You may not consider sympathy bias or prejudice. And may I say you may not guess as to possibilities outside of the evidence that you heard in this courtroom. You must and you have to decide the issues that's [sic] in front of you in this case only on the evidence that you heard in this courtroom.
>
> You all know that for the purpose of returning a verdict at this time all twelve of you must agree. And you have a duty to agree, if it is at all possible.
>
> Now when you talk to each other in that jury room, obviously each one of you should pay the proper respect to the other person's opinion. And if you do have differences, you should examine those differences in the spirit of honesty and fairness.
>
> I'm not suggesting by any stretch of the imagination that any one of you should give up a well-grounded opinion or to [sic] violate your oath. But it does mean that jurors should not refuse to agree because of mere stubbornness.

---

12. Because the trial counsel did not object to the original instructions or the use of the supplemental charge, we review the instructions and charge under the plain error doctrine. Fed.R.Crim.P. 52(b). Under that review, relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights. *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137

L.Ed.2d 718 (1997). Having reviewed the record in this case, we hold that, in light of the preliminary instruction used by the trial judge, the supplemental charge to the jury was plain error in that there is a reasonable likelihood that the jury applied the challenged supplemental charge in a manner that violates the Constitution.

Each one of you should examine the facts from your own viewpoint and from the viewpoint of other jurors.

Now the verdict of the jury obviously should represent the opinion of each one of you. But this doesn't mean that you can't change your opinions, changing them by talking to each other, because the very object of this whole system is to reach an agreement by each one of you comparing your different views.

So I don't think you're deadlocked. You go back there and talk it over.

(Tr. Vol. VII, at 683–84). Thereafter, the jury continued its deliberations and returned with a recommendation that Petitioner be sentenced to death.

We believe that the trial judge's original charge to the jury correctly impressed upon them that they had to determine whether Petitioner would or would not receive the death penalty based on the weight of the aggravating factors before beginning deliberations on recommending either of the two life sentences. However, while the weighing of the aggravating versus mitigating factors essentially makes the consideration of the death sentence the jury's first calculation, Ohio Rev.Code § 2929.03(D)(2) clearly indicates that *absent* a unanimous determination by the jury that the aggravating factors outweigh the mitigating factors the jury should then determine which of the two life sentences to recommend to the court. We believe that the jury's communication to the trial court carried, at the least, the message that they could not unanimously agree on whether the aggravating factors outweighed the mitigating factors to recommend the death sentence.

Thus, in accordance with the language of Ohio Rev.Code § 2929.03(D)(2), we hold that the trial judge should not have sent the jury back to deliberate on the recommendation of the death sentence. Instead, the trial judge's supplemental charge to the jury should have informed them that they should then choose between one of the two life sentences under § 2929.03(D)(2).

In essence, the trial judge's original charge to the jury was misleading by not following the language of § 2929.03(D)(2), and, as a consequence, his supplemental charge to the jury only increased the chance for an arbitrary sentence of death being imposed. Having failed to recognize and execute the language of Ohio Rev. Code § 2929.03(D)(2)—"absent such a finding"—and instruct the jury that it should choose between one of the two alternative life sentences, we believe that Petitioner's Petition for a Writ of Habeas Corpus should be GRANTED insofar as the sentence of death is concerned, and this case REMANDED with instructions to issue the writ of habeas corpus, subject to the State imposing a new sentence within ninety-days (90) of this Order.

### CLAIM 16:

**Ohio state courts have effectively converted Ohio's post-conviction procedure into a meaningless ritual, rather than a statutorily mandated process for those convicted of a criminal offense to obtain redress for violations of their rights under the Ohio Constitution and the Constitution of the United States. As a result, Petitioner's convictions and death sentence are infirm under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his sixteenth claim for relief, Petitioner asserts the State of Ohio's post-conviction proceedings are a "meaningless ritual" that have deprived him of his constitutional rights of due process, equal protection, adequate trial and appellate review, and the right to be free from cruel and unusual punishment. Petitioner assails the policies and procedures adopted by the Ohio trial and appellate courts as being set up in a manner that enable the courts to summarily dispose of a defendant's constitutional claims. Petitioner maintains that the appellate record is incomplete and mislead the state appellate courts in regards to the

trial court's actions. For example, Petitioner asserts that several bench conferences, exhibits, and photographs are missing from the record. As a consequence of the record being incomplete, Petitioner asserts that this Court cannot accept the presumption of correctness on the factual findings made by the state courts pursuant to Ohio Rev.Code § 2953.21.

 Respondent asserts, and we agree, that errors in post-conviction proceedings are not cognizable in federal habeas corpus. Generally, pursuant to Title 28 U.S.C. § 2254(a), habeas corpus is available to a state prisoner on the ground that he or she is in custody in violation of the Constitution or laws or treaties of the United States. Thus, the essence of habeas corpus is that it is "an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure that person's release from the illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). We find that Petitioner's assertion in this case, namely that his post-conviction proceedings were meaningless, is merely a claim that the state post-conviction proceeding was erroneous in the manner it dealt with his case. However, such a claim of error cannot serve as a basis of federal habeas corpus relief. *Kirby v. Dutton*, 794 F.2d 245, 247–48 (6th Cir.1986); *accord Williams–Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir.1990) (indicating that § 2254 does not authorize federal courts to review the infirmities in a state post-conviction relief proceeding); *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir.1988); *Vail v. Procunier*, 747 F.2d 277, 277 (5th Cir.1984) ("Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief."); *Mitchell v. Wyrick*, 727 F.2d 773, 774 (8th Cir.1984); *Williams v. Missouri*, 640 F.2d 140, 144 (8th Cir.1981) ("Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself. . . ."); *Cornell v. Maryland*, 396 F.Supp. 1092, 1094 n. 3 (D.Md. 1975); *Stokley v. Maryland*, 301 F.Supp. 653, 657 (D.Md.1969). The habeas corpus petition must directly dispute the fact or duration of the confinement. *Kirby*, 794 F.2d at 248 (declining to read the scope of the writ of habeas corpus to reach complaints about the deficiencies in state post-conviction proceedings).

Accordingly, we find that any errors that Petitioner asserts in his state post-conviction proceedings are not amenable to federal habeas relief. Therefore, Petitioner's claim that he was denied a fair review in state court of his petition for post-conviction relief is without merit. Petitioner's claim for relief under claim sixteen of his Petition is hereby DENIED.

*CLAIM 17:*

**The proportionality review conducted by the state appellate and supreme courts was incomplete and failed to ensure that Petitioner's sentence was not disproportionate. Petitioner's sentence violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his seventeenth claim for relief, Petitioner asserts that even though Ohio Rev. Code § 2929.05(A) is designed to deal with the sentence of death becoming arbitrary and capricious, the Hamilton County Court of Appeals and the Ohio Supreme Court construe the statutory provision in a manner that nullifies this function. Specifically, Petitioner first asserts that the Hamilton County Court of Appeals' decision to review only cases originating in Hamilton County places an arbitrary geographical limitation on its proportionality review. Secondly, Petitioner contends that both the court of appeals and the Ohio Supreme Court only review cases where a sentence of death has been returned and affirmed by the trial court. Therefore, because the cases in which the trial courts have imposed life imprisonment upon defendants

are not reviewed by the court of appeals or the Ohio Supreme Court, Petitioner argues that it is impossible for a reviewing court to find a sentence of death to be disproportionate. According to Petitioner, the creation of such an impossibility, and consequently the nullification of Ohio Rev.Code § 2929.05(A), is a violation of Petitioner's rights under the Constitution.

The Ohio Supreme Court rejected Petitioner's contention regarding proportionality review and upheld paragraph one of the syllabus in *State v. Steffen,* 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), stating that "[t]he proportionality review required by [Ohio Rev.Code § ] 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *Henderson,* 39 Ohio St.3d at 33, 528 N.E.2d 1237.

■ We find that while proportionality review is considered to be an additional safeguard against arbitrarily imposing the death penalty, there is no federal constitutional requirement that a state appellate court conduct comparative proportionality review. *Pulley,* 465 U.S. at 50–51, 104 S.Ct. 871; *McQueen,* 99 F.3d at 1333. Additionally, it appears that the Ohio Supreme Court did perform a proportionality review of Petitioner's case, except that the Ohio Supreme Court's review only included cases in which the death sentence had already been imposed. The Ohio Supreme Court noted, and we agree, that, in accordance with the principles of *Steffen, State v. Stumpf,* 32 Ohio St.3d 95, 512 N.E.2d 598 (1987), and *State v. Coleman,* 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), such a review of Petitioner's case is appropriate.

Accordingly, we REJECT Petitioner's seventeenth claim for relief.

*CLAIM 18:*

**The trial judge's demeanor towards the defense counsel and also accusations of trickery and deceit in front of the jury denied Petitioner Henderson the right to a fair trial and the effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his eighteenth claim for relief, Petitioner asserts that throughout the trial proceedings the judge made continuous hostile comments and criticisms toward defense counsel that resulted in a deprivation of his right to a fair trial. Petitioner suggests that the disparaging remarks of the trial judge had a two-fold effect on his case. First, he asserts that the remarks imparted upon the jury the judge's attitude toward the defense counsel and his theory in defense of the case. Secondly, Petitioner asserts that the judge's hostile remarks served to intimidate and preclude the effective assistance of his counsel.

Some of the comments that Petitioner points to that allegedly revealed the trial judge's partiality and deprived him of due process include:

> Court: She doesn't understand that. And she said she's going to accept the law as it is going to be given to her.

*(Voir dire* Tr. I, at 66).

> Court: You don't have to tell him what you think that means. Go ahead. How would she know what she thinks that means? I'll tell her what it means if she's ever a juror.

*(Voir dire* Tr. II, at 146).

> [Defense counsel]: Okay, now, as Jerome Henderson is sitting here today, he is entitled to your presumption of total innocence, even though he's sitting here at counsel table with the Grand Jury of this country having returned an indictment. You understand that?
>
> [Prospective juror]: Yes.
>
> [Defense counsel]: Do you think the Grand Jury would do that if he weren't guilty?
>
> The Court: Well, now, how would she know? That's not a fair question. You don't have to answer that.

[Defense counsel]: We would, I would like to have your feelings on the presumption of innocence.

The Court: Well, that has nothing to do with the presumption of innocence, what her opinion is of a Grand Jury returning an indictment without evidence, whatever you said. It's ridiculous. How could I answer that question?

You don't have to answer it.

Note the objection. Overruled.

[Defense counsel]: Well, if there is an indictment, can you tell me what your feelings are about just the fact that there's an indictment?

The Court: Do you know what an indictment is?

[Prospective juror]: Well, that he has been—the evidence would bring him to trial, I would assume.

The Court: Well, you have some general idea.

But see, you're using terms here that later on the Court will define to them, will explain to them. I am not going to go through the law. I have given you a lot of leeway on both sides because it is a capital case. But what you are doing, you're tricking people. Don't trick them. Ask them right out. Tell them, I don't mind if you tell them that he is presumed innocent, right now he's innocent, there's no guilt upon him. The State must prove him guilty. You don't have to prove anything. I don't mind any of that.

But let's go into this trickery: what is an indictment? What did the Grand Jury do?

Go ahead.

[Defense counsel]: Note my objection to the statement of the Court.

(*Voir dire* Tr. II, at 216–18).

Petitioner also asserts that the trial judge made a number of comments outside of the jury's presence at the sidebar that were hostile toward his defense counsel and, in essence, his case. Specifically, Pe-

titioner points to the sidebar discussion that the trial judge stated:

Court: We're not going to do this. You don't have this paranoia, this fear, that your client's going to be identified by every witness and do this back and forth, do you?

(Trial Tr. I, at 97). Petitioner than proffers this statement of the judge's discussion with the prosecution for comparative purposes:

Court: You've said that, but nobody has really shown that. He wasn't there. You said you went there and his grandfather showed you in. You are going to put the grandfather on, I assume.

Ms. Flessa: Your Honor, his clothing was found there. He admitted these were his shoes up in the bedroom floor [sic].

Court: He didn't admit these were his. They could just be [sic] there.

Valentine: That's why we have the papers found in the coat.

Court: The coat was found in an apartment, but there are many people found in an apartment, and the clothes being there, but it's not his apartment. You could be there overnight for any reason. But nobody has tied up this place being his apartment. The address was 1949, was that—no 1909 Highland Avenue. There was an objection when you said: was this the defendant's apartment?

Now, you told me you were going to use the grandfather, and he was going to sit there and say that's where the boy lived, the defendant lived. Are you going to do that?

Mr. Valentine: We weren't going to. We will.

(Trial Tr. V, at 371–72). The defense counsel objected to this discussion, which was outside of the presence of the jury.

Finally, Petitioner proffers the trial judge's statement in regards to the prose-

cution's peremptory challenge of an African–American juror. Petitioner asserts that the judge's indication that the prosecutor used his peremptories logically also revealed his hostility toward Petitioner.

Contrary to Petitioner's contention, Respondent argues that the claim lacks merit because both parties were held to the same standard by the judge and equally criticized and corrected when wrong. As for the trial judge's comments regarding defense counsel's "trickery," which Petitioner contends were the most damaging comments made by the trial judge, Respondent asserts that the judge had every right to control trickery. Respondent argues that at no time did the trial judge's comments rise to a level of being fundamentally unfair, and this Court should deny Petitioner's claim.

The Supreme Court of Ohio reviewed the exchange during the *voir dire* proceeding to that Petitioner complains deprived him of his right fair trial. *Henderson,* 39 Ohio St.3d at 32–33, 528 N.E.2d 1237. Although the Ohio Supreme Court believed that the trial judge "might have chosen better words to express himself," the Supreme Court agreed with the court of appeals that the trial judge correctly cited defense counsel's questions regarding the grand jury as unfair. *Id.* at 33, 528 N.E.2d 1237. The Ohio Supreme Court also acknowledged that the trial judge charged the jury at the close of the guilt phase accordingly:

> If during the trial I might have said something or I might have done something here that may give you some indication how I feel about the facts, I'm telling you now to forget it, because you are the only judges of the facts.

*Id.* Noting that the trial judge provided this charge, the Ohio Supreme Court concluded that the jury presumably followed the instructions of the trial court. *Id.*

■ We find the Petitioner's claim that he was deprived of a fair trial because of the trial judge's comments and criticism is without merit. Certainly, a trial judge must be cognizant of his comments during the proceedings because those comments may impart a negative or positive effect upon the jury about a party's case. *State v. Thomas,* 36 Ohio St.2d 68, 71–72, 303 N.E.2d 882, 884 (1973). Moreover, we recognize the obligation of a trial judge is to remain an impartial and unbiased observer. Every defendant is entitled to expect that the judge will not act as an arm of the prosecution or become an adversary. This expectation is especially true when, as in this case, an unsympathetic defendant stands accused of a serious offense. Thus, trial judges should seek to avoid "even the appearance of judicial bias." *Anderson v. Sheppard,* 856 F.2d 741, 746 (6th Cir.1988).

■ Nevertheless, there is no absolute prohibition against a trial court commenting during the proceedings. *See Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894) ("It must be noted that no absolute prohibition exists to preclude comment by a court during trial. It must also, however, be borne in mind that . . . the influence of the trial judge on the jury is necessarily and properly of great weight, . . .").

■ In this case, we do not find that the trial judge's statements during *voir dire* were prejudicial to Petitioner's right to a fair trial. Indeed, the term "trickery" may not have been the "better word" to express his feelings for the manner he believed defense counsel was questioning the prospective jurors. However, we do not believe that such term was fatal to Petitioner's constitutional right to a fair trial. Furthermore, the trial judge specifically stated during the colloquy with defense counsel that Petitioner should be presumed innocent subject to the State satisfying its burden of proving him guilty.

■ Also, we disagree that the allegedly biased and belittling remarks made by the trial court outside of the presence of the jury, namely during the sidebar discussions, amount to an influence of bias by the

court and therefore a deprivation of Petitioner's constitutional rights. *See United States v. Smith*, 928 F.2d 740, 742 (6th Cir.1991) (opining that the trial judge's allegedly biased and belittling remarks to defense counsel made at sidebar out of hearing of jury did not amount to reversible error or a new trial). There is simply no evidence that these remarks in any way were overheard by the jury and thereby imparted some sort of judicial influence.

We also conclude that the record reveals that the trial judge applied the same standard in admonishing the defense counsel as well as the prosecuting counsel during the trial proceedings.

▮ Finally, we find it significant that the trial judge did charge the jury to disregard anything that he may have said or done during the proceedings that may have given the jury a sense of how he felt about the facts of the case. The trial jury is presumed to follow the instructions given to it by the judge, *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), and we conclude that Petitioner has provided nothing in the way of evidence to show that the jury did anything other than follow the instructions. In this matter, we will not presume or speculate that the jury failed to or disobeyed in following the instructions of the trial court.

Petitioner's eighteenth claim for relief is hereby DENIED.

## CLAIMS TWENTY, TWENTY-ONE, TWENTY-TWO & TWENTY-THREE:

Petitioner was denied due process during his post-conviction proceedings because his trial court judge was not a neutral, detached magistrate, was biased against him and had prejudged the case, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner was denied due process during his post-conviction proceedings because counsel was never notified by the clerk of court's ruling on the post-conviction petition. Appellate Rule 4(A), Ohio Rules of Appellate Procedure, and Rule 58(B), Ohio Rules of Civil Procedure require the clerk to serve the parties with notice of the judgment. This did not occur. The failure of the State to follow its own rules is a denial of due process, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner was denied due process during his post-conviction proceedings when the Hamilton County Clerk of Courts, being in actual possession of the notice of appeal, failed to file stamp same in a timely fashion. This failure on the part of the Clerk was used by the State when it successfully moved the appellate court to dismiss the appeal because the notice of appeal did not bear a timely file stamp, thus denying Petitioner the opportunity to appeal the trial court's dismissal of his post-conviction petition and the findings of fact and conclusions of law.

Petitioner was denied due process when the Ohio Supreme Court granted the State's motion to dismiss the appeal because notice filed with the appellate court contained the trial court case number. No rule in Ohio law requires that a notice of appeal bear any number. If the Ohio Supreme Court has so construed its rules of practice, it violates due process to apply the new rule against Petitioner. The entire procedure denied Petitioner Henderson the opportunity to challenge the trial court's dismissal of his post-conviction petition and the findings of fact and conclusion of law in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

As we stated in our analysis of Petitioner's sixteenth claim for relief, Title 28 U.S.C. § 2254(a) is available to a state

prisoner who is attacking the legality of his or her custody in violation of the Constitution or laws or treaties of the United States, *Preiser,* and cannot review the infirmities of a state post-conviction relief proceeding. *Kirby,* 794 F.2d at 247–48.

Having made this conclusion, we find Petitioner's twentieth, twenty-first, twenty-second, twenty-third grounds for relief without merit.

## CLAIM 26 (Issues not found to be procedurally defaulted):

As noted earlier in the procedural default subsection of this Order addressing Petitioner's twenty-sixth claim for relief, Petitioner did assert a number of claims that were presented to the state courts, and, thus, can be heard on the merits.

Petitioner first argues that the Ohio death scheme is unconstitutional because it is not imposed in accordance with "evolving standards of decency" and is disproportionately exacted on African–Americans. In his Petition, he suggests that the uncontrolled discretion of prosecutors in the indictment decision-making process results in the death penalty having a racially disparate impact on African–Americans. Furthermore, Petitioner asserts that the death penalty does not deter others from committing crime. In essence, Petitioner contends that Ohio's statutory scheme does nothing more than degrade the dignity of human beings, especially African–Americans.

Petitioner proffers a study prepared by the office of the Ohio Public Defender (hereinafter "Ohio Report") in support of his claim that the death penalty scheme in Ohio has a racially disparate impact on African–Americans. For the purposes of the analysis below, the Court will assume that the statistical conclusions presented in the Ohio Report are true and accurate.

The Ohio Report indicates that African–Americans constitute only 10.6% of Ohio's population but represent greater than 50% of Ohio's death row inmates.[13] The Ohio Report further shows that from 1981 to 1992, there were 3,309 white murder victims and 4,155 minority murder victims in Ohio, however, 88% of the defendants on death row and 63% of the death penalty cases in Ohio involved white murder victims.

We note that similar studies have been offered by defendants in death penalty cases. In *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a seminal case in this vein, the United States Supreme Court addressed a study (hereinafter "the McCleskey study") that purported to show a disparity in the imposition of the death penalty in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant. The McCleskey study concluded that prosecutors sought the death penalty in a greater percentage of cases involving an African–American defendant and a white victim than in cases where the defendant and the victim were the same race or where the defendant was white and the victim was African–American. *Id.* at 286–87, 107 S.Ct. 1756. However, the Court rejected the McCleskey study's findings, holding that the study was insufficient to support an inference that any of the decisionmakers in the defendant's case acted with discriminatory purpose. The Court declared that, to prevail under the Equal Protection Clause, a defendant must prove that the decisionmakers in his case acted with discriminatory purpose. *Id.* at 292–97, 107 S.Ct. 1756.

The *McCleskey* court also rejected an analogous claim brought by the defendant that the state had violated the Equal Protection Clause by adopting a death penalty statute and allowing it to remain in force despite its allegedly discriminatory application. The Court concluded that in order for such a claim to prevail, the defendant

**13.** Petitioner indicates that at the time of filing his Traverse, 73 of the 141 death row inmates were African–American.

would have to prove that the legislature enacted or maintained the death penalty statute because of an anticipated racially discriminatory effect. *Id.* at 298, 107 S.Ct. 1756.

■■■ In the instant case, the Ohio Report, standing alone, does not support an inference that racial considerations affected Petitioner's sentencing. Furthermore, Petitioner has proffered no evidence showing that the Ohio Legislature either enacted or maintains its death penalty statute to ensure a racially disparate impact on minorities.

The *McCleskey* court also addressed the defendant's claim that racial considerations may have influenced capital sentencing decisions in violation of the Eighth Amendment. In its analysis of this claim, the Court in *McCleskey* concluded that, although the study at issue indicated a discrepancy that appeared to correlate with race, it did not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process. *Id.* at 312–13, 107 S.Ct. 1756.

In addition, an argument similar to Petitioner's claim here was rejected in an earlier decision by the Supreme Court. *See Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Gregg,* Justice White, in a concurring opinion joined by Chief Justice Burger and Justice Rehnquist, stated that "[a]bsent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." *Id.* at 225, 96 S.Ct. 2909. Petitioner has not presented such evidence in connection with his facial challenges to the statute. This Court, therefore, concludes that, for the same reasons cited in *McCleskey* and *Gregg,* this claim is without merit.

Next, Petitioner argues that the Ohio death penalty scheme violates the Constitution by requiring proof of aggravating circumstances in the guilt phase of capital trials. Specifically, Petitioner claims that Ohio Rev.Code § 2929.04(A)(7), which provides that a defendant is eligible for the death penalty if he commits murder during the commission of an aggravated robbery, duplicates or repeats an element of aggravated felony murder under Ohio Rev.Code § 2903.01(B). In opposition, Respondent proffers the case of *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), to demonstrate that the Supreme Court has rejected this argument.

■■■ The Eighth Amendment requires that a "capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Lowenfield,* 484 U.S. at 244, 108 S.Ct. 546 (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). The *Lowenfield* court stated that the requirement to narrow the class of capital offenses may be achieved in two ways:

> ... The legislature may itself narrow the definition of capital offenses ... so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by the jury findings of aggravating circumstances at the penalty phase.

*Id.* at 246, 108 S.Ct. 546.

It is undisputed that Ohio Rev.Code §§ 2929.04(A)(7) and 2903.01(B) contain substantially similar language and that the sentencing jury in this case made its finding of an aggravated circumstance at the guilt phase in the state court proceedings. In his Traverse, Petitioner asserts that Ohio has not narrowed the class of capital offenses under either method described in *Lowenfield.* Petitioner argues that Ohio, unlike the State of Louisiana in *Lowenfield,* has not narrowed the class of capital offenses by narrowing the definition of the underlying offense because an Ohio jury may find a person guilty of aggravated

murder and yet find that person ineligible for the death penalty. He further argues that the Ohio death penalty scheme does not comply with *Lowenfield* because the evidence supporting the aggravating circumstances is introduced at the guilt phase of the trial rather than the penalty phase. The Court, however, disagrees that these are appropriate grounds with which to distinguish *Lowenfield.*

In *Lowenfield,* the Supreme Court explained the role of aggravating circumstances in guiding the discretion of the sentencing body as follows:

> The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

*Id.* at 244–45, 108 S.Ct. 546. Thus, the Court's principal concern is whether the class of death-eligible persons is narrowed. Ohio Rev.Code § 2929.04(A)(7) performs this narrowing function by requiring that the aggravated murder be committed while the offender was "committing ... kidnaping, rape, aggravated arson, aggravated robbery, or aggravated burglary." As Petitioner acknowledges in his Traverse, the fact a person is found guilty of aggravated murder does not necessarily make that person death-eligible (Traverse, p. 92). A defendant found guilty of aggravated murder may, in certain circumstances, receive a penalty of life imprisonment only. *See* Committee Comment to Ohio Rev.Code § 1903.01. Thus, the Court concludes that this claim is without merit.

Petitioner also argues that Ohio death penalty scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial (Traverse, p. 93). Petitioner cites to the concurring opinion of Justice Blackmun in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) in support of his argument. However, this Court respectfully declines to follow the reasoning of Justice Blackmun and adopts the reasoning of the Ohio Supreme Court in *Buell,* which dismissed a similar claim raised by the defendant in that case.

Petitioner also argues that Ohio Rev.Code § 2929.03(D)(1), which provides that if a presentence investigation or mental examination is requested by the defendant then it shall be provided to the jury, violates his rights to due process and effective assistance of counsel (Traverse, p. 93). Specifically, Petitioner contends that giving this information to the jury forfeits his right to control and present a penalty phase defense as well as his right to counsel. The Court finds this argument unpersuasive. Under § 2929.03(D)(1), the court may not require a presentence report or mental examination unless it is requested by the defendant. While a defendant who requests such information takes the risk of exposing to the jury potentially incriminating evidence, this Court concludes, as did the court in *Buell,* and *State v. Esparza,* 39 Ohio St.3d 8, 529 N.E.2d 192 (1988), that there is nothing constitutionally infirm in providing a defendant with this option. Therefore, the Court concludes that this claim is without merit.

The next argument Petitioner presents is that the Ohio death penalty scheme is unconstitutional because it does not provide adequate proportionality review. However, the Court finds that a proportionality review of Petitioner's sentence is not required by the U.S. Constitution. *Pulley,* 465 U.S. at 43, 104 S.Ct. 871. Nevertheless, Ohio has chosen to require its appellate courts review a judgment in a capital case to determine whether a death sentence is appropriate. Ohio Rev.Code § 2929.05(A). A reviewing court satisfies § 2929.05(A) by comparing the case under review to other cases where it imposed the death penalty. *State v. Steffen,* 31 Ohio St.3d 111, 123–25, 509 N.E.2d 383, 394–95 (1987).

In *State v. Henderson*, the Ohio Supreme Court rejected Petitioner's argument that in a proportionality review the appellate court should consider capital cases in which the death penalty was not recommended. *Id.* at 33, 528 N.E.2d 1237. Furthermore, the *Henderson* court acknowledged that the *Steffen* court's rejection of Petitioner's argument had been approved in *Stumpf* and *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988). *Id.* Here, Petitioner argues that the proportionality review in Ohio violates the Due Process Clause because the reviewing courts are not required to consider cases where a life sentence was imposed.

■ While the decision in *Pulley* was based on the Eighth Amendment, this Court concludes, for the same reasons, that the Due Process Clause is not violated where Ohio decides to limit its proportionality review to those cases where the death penalty has been imposed. At best, Petitioner's claim constitutes a challenge to the Ohio Supreme Court's interpretation and application of Ohio Rev.Code § 2929.05(A). A federal court, however, may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley*, 465 U.S. at 41, 104 S.Ct. 871; *Olsen v. McFaul*, 843 F.2d 918, 933 (6th Cir.1988) ("For excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting a writ of habeas corpus."). Consequently, this Court concludes that this claim is also without merit.

■ Petitioner also maintains that the Ohio death penalty scheme is unconstitutional because it does not provide the sentencing authority with the option to choose a life sentence even if the aggravating circumstances outweigh the mitigating factors, and it does not allow a jury to determine whether death is an appropriate remedy (Traverse, p. 96–97). Petitioner's argument is similar to the argument put forth by the defendant in *State v. Williams*, 23 Ohio St.3d 16, 24, 490 N.E.2d

906, 914 (1986). Under the Ohio statute, the ultimate decision of whether to impose a death sentence rests with the trial judge and not the jury. Ohio Rev.Code § 2929.03(D)(3) requires the trial judge, if the jury recommends the death penalty, to make a finding "by proof beyond a reasonable doubt ... that the aggravating circumstances ... outweigh the mitigating factors" before a death sentence may be imposed. The jury's recommendation of the death sentence is advisory and nonbinding on the trial court. A jury recommendation of life imprisonment, however, is binding on the trial court. *Jenkins*, 15 Ohio St.3d at 200, 473 N.E.2d 264. The Constitution requires the use of sentencing procedures that ensure the sentencing body's discretion is directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909. The Ohio statute satisfies this requirement. Under Ohio Rev. Code § 2929.03(D)(2), the jury is afforded the opportunity to impose a life sentence. The death penalty becomes mandatory only if the trial judge ultimately decides that the aggravating circumstances outweigh the evidence given in mitigation. *Williams*. Such a sentencing scheme is not unconstitutional.

■ Finally, Petitioner asserts that Ohio's execution process is unconstitutional because it violates the prohibition against cruel and unusual punishment (Traverse, p. 97). Petitioner asserts that in the State of Ohio a condemned prisoner is offered the choice between death by lethal injection and death by electrocution, both of which are excessive. Furthermore, Petitioner asserts that having a person choose between the manner in which they will be put to death is both cruel and unusual punishment (*Id.*). We find Petitioner's assertion unpersuasive in light of *In re Kemmler*, 136 U.S. 436, 441, 10 S.Ct. 930, 34 L.Ed. 519 (1890) and *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir.1994) in which the

courts have upheld these methods of execution as being constitutional.[14]

Accordingly, none of the issues raised by Petitioner in his twenty-sixth claim for relief warrant the issuance of a writ of habeas corpus.

### CLAIMS 10, 10(A) and 10(B) : (Issues not found to be procedurally defaulted).

As stated earlier, Petitioner asserts a number of claims in his tenth ground for relief that allegedly demonstrate that he was denied effective assistance of counsel during the proceedings. Having previously reviewed these claims and determined that a number of the particular issues were procedurally defaulted by Petitioner, we will now address the remaining claims on the merits.

In asserting his ineffective assistance of counsel claims, Petitioner contends that there were errors made by his counsel alone as well as errors by the trial court judge that rendered his counsel's representation ineffective.

First, in regards to the alleged errors of the trial court, Petitioner asserts that the trial court erred by: (1) refusing to appoint of co-counsel to assist with his case, even though it was standard practice in the State of Ohio to appoint two attorneys to represent an indigent defendant in a capital case; (2) limiting the *voir dire* proceedings; (3) berating counsel in front of the jurors; (4) denying the authorization of funds for Petitioner to employ a psychologist or psychiatrist in preparation of mitigation; and (5) denying Petitioner's request for a two-to three-week continuance to prepare for mitigation.

As we stated earlier, in order to establish a constitutional violation of ineffective assistance of counsel, it must be shown both that counsel's representation fell below an objective standard of reasonableness and that his deficiencies prejudiced the defendant. *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052.

First, Petitioner asserts that the trial judge erred by refusing to appoint co-counsel to assist in his representation, even though it was customary in Ohio to do so in capital cases. However, we note that, contrary to Petitioner's contention in his Petition, Attorney Shea never made a request for the appointment of co-counsel. Instead, Attorney Shea stated to the court that the defendant is indigent and moved for a daily copy of the transcript to be provided by the court (*Voir dire* Tr., at 70–71). Attorney Shea also indicated that he had been retained by Petitioner's family and would be trying the case alone without co-counsel, even though he knew that it was customary to have two (*Id.*). In light of the record, we do not find that a motion to appoint co-counsel was ever made to the trial judge by counsel. Therefore, this contention is misplaced.

▮ Next, Petitioner's assertions that the trial court placed undue limitations on the *voir dire* is without merit. Reviewing the record, we note that Petitioner was able to question jurors about their views on the death penalty and the presumption of innocence as it related to him. The trial judge did indicate at one time that he did not want defense counsel engaging in "trickery." However, this action by the court was not such an undue limitation placed on Petitioner that he could not carry out a meaningful *voir dire* examination.

▮ Third, Petitioner asserts that the trial court's berating of his counsel in front of the juror greatly impaired his ability to represent Petitioner, and thus, rendered his representation ineffective. We find this argument unpersuasive because the record does not show that Attorney Shea acted any different than any other attorney under the circumstances. In other

---

**14.** *See also Sullivan v. Dugger,* 721 F.2d 719, 720 (11th Cir.1983) (electrocution); *Spinkellink v. Wainwright,* 578 F.2d 582, 616 (5th Cir.1978) (electrocution); *State v. Hinchey,* 181 Ariz. 307, 890 P.2d 602 (Ariz.1995) (lethal injection) *Harrison v. State,* 644 N.E.2d 1243 (Ind.1995) (electrocution).

words, nothing in the record demonstrates that Attorney Shea's representation due to the trial judge's comments fell below an objective standard of reasonableness, and thus, the first prong of the *Strickland* analysis has not been triggered. *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052.

Petitioner also maintains that the trial court's denial of funds for Petitioner to employ a psychologist or psychiatrist in preparation of mitigation rendered his counsel ineffective. We disagree for the reasons set forth in our review of Petitioner's seventh ground for relief.

We also disagree with Petitioner's contention that the trial court's denial of his request for a two to three-week continuance to prepare for mitigation rendered his counsel ineffective in light of the reasons set forth in our review of Petitioner's fifth ground of relief.

Finally, Petitioner asserts that errors made by his defense counsel were so egregious as to constitute ineffective assistance of counsel. However, having reviewed the transcript, we cannot say that the choices Attorney Shea made in his representation of Petitioner were anything other than reasonable and strategic in light of his experience. *See Strickland*, 466 U.S. at 681, 104 S.Ct. 2052.[15] Moreover, aside from the trial counsel's failure to object to the language of the preliminary charge and subsequent supplemental charge at the penalty phase of the proceedings, none of the assertions that Petitioner makes shows with a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different.[16] *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052.

## CONCLUSION

Having reviewed the briefs, arguments of counsel, and the record below, we conclude that Petitioner's Petition for a Writ of Habeas Corpus fails to show that his rights under the Constitution were violated in any manner during the guilt phase of his proceedings. However, the record reflects that Petitioner did not receive fair and just process under the laws of the United States during the penalty phase of the proceedings. Even though the jury deliberated whether the aggravating factors outweighed the mitigating factors long enough to enable it to recommend the imposition of the death-sentence and it came to a conclusion that it was "deadlocked period," the trial judge sent the jury back to continue to deliberate. We believe that after the jury expressed to the trial court that it could not reach a decision on whether the aggravating factors outweighed the mitigating factors to recommend the death sentence, and in accordance with the language of O.R.C. § 2929.03(D)(2)—"absent such a finding", the trial judge should have instructed the jury that it should then determine which of the two life sentences would be just punishment in this case. In essence, we believe that the actual supplemental charge given by the trial judge only created, if not heightened, the risk of an erroneous imposition of the death penalty in violation of Petitioner's Eighth and Fourteenth Amendments rights under the Constitution.

Accordingly, we conclude that whether or not certain of the issues were waived in this case, there has been no miscarriage of justice in the guilt phase of the proceedings. However, for the reasons stated in

**15.** Petitioner also asserts that his appearing at the *voir dire* proceedings is evidence of his counsel's ineffectiveness. We find that this claim has been waived by Petitioner for failing to present it in the state courts. *Wainwright*, 433 U.S. at 87, 97 S.Ct. 2497. Furthermore, even assuming that Petitioner did not procedurally default this claim, we find it without merit.

**16.** A discussion of this Court's findings concerning the preliminary and supplemental charges by the trial judge at Petitioner's sentencing is set forth in our analysis of Claim 9 of Petitioner's Petition for a Writ of Habeas Corpus.

the penalty phase, Petitioner's Petition for a Writ of Habeas Corpus is GRANTED insofar as his sentence of death is concerned, and this matter is REMANDED with instructions to issue the writ of habeas corpus, subject to the State imposing a new sentence within ninety-days (90) in accordance to one of the two alternative life sentences under Ohio Rev.Code § 2929.03(D)(2).

SO ORDERED.